# People's Gaslight and Coke Co.

## v.

# Chicago Gaslight and Coke Co.

1. Quasi public corporations—Executing franchises.—A corporation, the charter of which is permissive only and not imperative, and which is not vested with any exclusive privilege, is not bound by implication arising from the acceptance of the charter to execute its franchises throughout the entire territory in which it is authorized to operate.

2. Contract between gas companies not to compete with each other.—Appellee, a gas company, was incorporated by act of Feb. 12, 1849, and was given "full power and authority to manufacture and sell gas to be made from * * * and to be used for lighting the city of Chicago, * * * and to lay pipes for the conducting of the gas in any of the streets or avenues of said city." It was given the exclusive privilege of supplying the city of Chicago and its inhabitants with gas for ten years. Appellant was incorporated by act of Feb. 12, 1855. The language in the grants to the two companies was almost identical. Appellant, however, was forbidden to lay pipes until Feb. 12, 1859, except with appellee's approval. Appellee was furnishing gas on the north and south sides, and to the city and a few persons on the west side; appellant had laid its pipes on the south and west sides, when, in April, 1862, appellee, in consideration of a sum of money paid by one Garrison, and the conveyance of appellant's gas mains, etc.. on the south side, and its right to distribute gas there, and appellants and G.'s covenant not to lay gas pipes or distribute gas on the south or north sides for a hundred years, agreed to convey to G. its improvements, gas mains, etc., on the west side, and its right to distribute gas there, and made a similar covenant not to interfere with appellant on the west side. *Held*, that the contract was one which, from anything expressed in the charters of the companies, or to be implied from the granting of them, the companies were not forbidden to make; that it was one entirely within the scope of the powers impliedly given to the corporations, to conduct and manage their undertaking for their own profit and advantage and the public benefit and convenience.

3. Agreements in restraint of trade.—An agreement in general restraint of trade is contrary to public policy, illegal and void, but an agreement in partial or particular restraint upon trade may be good where the restraint is only partial, the consideration adequate, and the restrictions reasonable. The contract in this case, *held*, not contrary to public policy as being in restraint of trade or tending to create a monopoly.

4. Monopoly.—That is no monopoly which only secures one in the exclusive enjoyment of his business, as against a single competitor, while all the world besides are left at full liberty to enter upon the same enterprise.

5. SPECIFIC PERFORMANCE OF AGREEMENT IN PARTIAL RESTRAINT OF TRADE.—While the specific performance of a contract lies in the sound discretion of the court, the power is lodged in the court in order to prevent inequitable results, and will be exercised to perform a valid contract where a refusal to perform would result in manifest injustice. The contract in this case was carried out to the benefit of both companies for many years. Appellee, however, is now laying gas pipes on the west side. Upon bill of complaint filed by appellant, *held*, that equity will restrain appellee from thus violating its contract with appellant.

6. ULTRA VIRES—ESTOPPEL.—A corporation can not avail itself of the defense of *ultra vires* where the contract has been in good faith performed by the other party to it, and the corporation has had the benefit of the contract and of the performance.

APPEAL from the Superior Court of Cook county; the Hon. HENRY M. SHEPARD, Judge, presiding. Opinion filed January 6, 1887.

Appellant filed its bill of complaint in the superior court, and obtained a preliminary injunction restraining appellee from laying mains and pipes in the west division of the city of Chicago, in violation of a contract set out in the bill. Appellee answered the bill, and filed certain affidavits in support of the answer, and a motion was made by appellee to dissolve the injunction, which motion was granted by the court and an order was entered dissolving the injunction and dismissing the bill. The record was brought to this court by appeal, and application was made for an order continuing the injunction pending the hearing of the appeal, which order was made.

The record discloses the following facts: The Chicago Gaslight and Coke Company was incorporated by an act of the General Assembly, approved Feb. 12, 1849, the second section of which is as follows:

"The corporation hereby created shall have full power and authority to manufacture and sell gas, to be made from any and all of the substances, or a combination thereof, from which inflammable gas is usually obtained, and to be used for lighting the city of Chicago, or the streets thereof, and any buildings, manufactories, public places or houses therein contained, and erect all necessary works and apparatus, and to lay pipes for the conducting of the gas in any of the streets or avenues of

said city: Provided, that no permanent injury or damage shall be done to any street, lane or highway in said city. The real estate which the corporation is entitled to hold shall not exceed in value fifty thousand dollars."

Section 3 provides, among other things, that the capital stock of the corporation shall not exceed three hundred thousand dollars, and that "said company shall have the exclusive privilege of supplying the city of Chicago and its inhabitants with gas, for the purpose of affording light, for ten years."

Appellant, the People's Gaslight and Coke Company, was incorporated by an act approved Feb. 12, 1855. Section 2 of said act is as follows: "The corporation hereby created shall have full power and authority forthwith, upon its due organization under this act, to proceed to the erection of the necessary works for the manufacture of gas and coke within said city of Chicago, and on and after the 12th day of February, 1859, to manufacture and sell gas to be made from any and all the substances, or a combination thereof, from which inflammable gas is usually obtained, and to be used for the purpose of lighting the city of Chicago, or the streets thereof, and any buildings, manufactories, public places or houses therein contained, and to erect all necessary works and apparatus as aforesaid; and on and after the said 12th day of February, 1859, or sooner, by and with the consent of the Chicago Gaslight and Coke Company, to lay pipes for the purpose of conducting the gas in any of the streets and avenues of said city, with the consent of the city counsel: Provided, that no permanent injury or damage shall be done to any street, lane, or highway in said city. The real estate which this corporation is entitled to hold shall not exceed in value one hundred thousand dollars."

By section 3 the capital stock of the company was limited to five hundred thousand dollars, and section four limited the price of gas to the city, for public use, to a rate not exceeding two dollars per thousand, and to the inhabitants at not exceeding two dollars and fifty cents per thousand feet.

Aug. 30, 1858, an ordinance was passed by the common council giving to said appellant permission to lay its gas

mains, feeders and service pipes in any of the streets, alleys, avenues, public parks, etc., throughout the city, subject to the existing rights and privileges granted to the Chicago Gaslight and Coke Company, and subject to the consent of said last mentioned company, to be obtained in case pipes should be laid previous to February 12, 1859. Prior to April, 1862, appellant had, under the powers in its charter and the permission granted by the city ordinance, laid about six miles of pipe for mains in Lake and Wells streets, in the south division of Chicago, for the distribution of gas, and had also laid service pipes, all of which mains and service pipes were of great value, to wit, of the value of twenty thousand dollars, and had laid mains for the purpose of distributing gas in several of the streets of the west division of the city of Chicago, and connected service pipes therewith, all of which were of great value, to wit, one hundred thousand dollars, and acquired in the west division of the city a site for the construction of works for the manufacture and distribution of gas in the west, south and north divisions of the same.

Appellee, the Chicago Gaslight and Coke Company, had, prior to April, 1862, laid mains and service pipes in many of the streets of the west division, and was supplying the city with gas in said division, and also some seven hundred persons; and there had been deposited with it by its customers considerable sums of money to secure the payment of gas bills.

On April 23, 1862, an agreement was entered into between appellee of the first part, appellant of the second part and one C. K. Garrison of the third part, in and by which agreement appellee, in consideration of the payment to it by Garrison of the sums of money therein specified, and the covenants and agreements of said Garrison and appellant, sold and conveyed to said Garrison all the improvements, of every kind, belonging to said appellee on the west side of the Chicago river and its branches, in that portion of the city of Chicago known as the west division thereof, and all fixtures, etc., for manufacturing or distributing gas as the same were in the said west division, with the right to use the same in distributing or manufacturing gas, as fully as said appellee could convey the

same ; and in consideration of the conveyances so made to him, and by and with the consent of appellant, said Garrison did pay to said appellee the sum of forty thousand dollars ; and for and in consideration of the sale and conveyance of the said improvements by appellee to said Garrison, and of covenants and agreements therein contained, to be kept and performed by said appellee, said appellant and said Garrison separately, and each for themselves, agreed that they or either of them would not, during the period of one hundred years from that date, either jointly or severally, in their own names or in the names of any other party or parties, lay or cause to be laid any gas mains or gas pipes of any kind in the north and south divisions of said city of Chicago, or in such parts of the said city as may now or hereafter lie east of the north or south bran hes of the Chicago river, nor furnish nor sell illuminating gas to any person or persons for consumption or use within said portions of the city, nor during the period aforesaid interfere in any way with the business of said appellee in manufacturing and selling illuminating gas in said parts of the city.    And in consideration of the purchase and payment so made by said Garrison, and of the covenants and agreements of appellant and said Garrison in said agreement contained, said appellee agreed that it would not, during a like period of one hundred years from the date thereof, either directly or indirectly, lay or cause to be laid, any gas mains or gas pipes of any kind in the said west division of the city of Chicago, or in such part thereof as then or might thereafter lie west of the north and south branches of the Chicago river, nor furnish nor sell illuminating gas to any person for consumption or use within the said last mentioned portions of the said city, or interfere with or molest in any way whatever, the business of said appellant or said Garrison, or either of them, to manufacture and sell illuminating gas in said division of said city ; and further, in consideration of said sale and purchase and the covenants and agreements of said appellee, said appellant and said Garrison did thereby sell, transfer and convey to the said appellee all the gas mains or pipes, etc., laid by said appellant and said Garrison, or either of them, in the south division of said city.

It was further agreed that appellee should remain in possession of the mains, etc., in the west division, and use the same until June 1, 1862, at which time it would deliver them, and all parties agreed to execute and deliver to one another from time to time such further conveyances as should be deemed necessary to carry out the purposes of the agreement and for the protection of the legal and equitable rights of the parties.

On June 1, 1862, in pursuance of said contract, there were turned over to appellant all the contracts which appellee had with customers on the west side, which contracts were assumed and performed by appellant, and the money deposited by customers to secure said contracts was accounted for to said customers by appellant.

Prior to the making of the agreement set out, Garrison had made large advances to appellant for the purpose of laying mains, etc., and proposed to make further advances, and after making said agreement appellant leased its property and franchises to Garrison until he should be paid his advances. He took possession under his lease and greatly extended the works and plant, till October, 1862, when he assigned an interest to A. M. Billings, and thereafter further advances were made for the extension of the works of appellant and said works were in full operation on the first day of June, 1862, and, under said arrangement, Garrison and Billings supplied the city and the inhabitants of the west division with gas until November, 1874, when they surrendered their lease and the property to appellant, and since then appellant has extended its service and furnished gas amply sufficient for the west division, of good quality and at reasonable prices. The chief inducement for entering into the contract set out, was to relieve each company from the competition of the other, in the respective divisions of the city, to give appellant the right of distributing gas in the west division without the competition of appellee, and to give appellee the right of distributing gas in the south and north divisions without the competition of appellant. It is alleged in the bill, that, at the time of making the contract, appellee was limited in its means and unable to extend its mains so as to supply the west division, but this is denied in

the answer. It is further alleged that appellant and Garrison have in all things kept and observed said contract, by means whereof appellee has been enabled to distribute gas in the north and south divisions free from competition with appellant, whereby it has derived large profits which it would not otherwise have derived, and that it is now about and threatens to lay its mains and service pipes in the west division for the purpose of supplying gas there in violation of its said contract.

The answer denies that said appellant and Garrison have kept said contract; says that other organizations have been formed for the purpose of selling gas, and have engaged in said business in the north and south divisions of the city, and on information and belief, says that such organizations have confined themselves to the north and south divisions with the support and connivance of appellant, and that such competition required appellee to re-assert its right to supply gas in all portions of the city; admits that it has undertaken the work of laying mains, etc., in the west division for the purpose of supplying gas therein, and insists that all provisions of said contract in any manner abridging the right of appellee to lay pipes and supply gas in the west division, are contrary to public policy ; in restraint of trade ; tend to create a monopoly; and are void and not to be enforced in a court of equity.

Mr. C. BECKWITH and Mr. WILLIAM BROWN, for appellant; that a *quasi* public corporation does not, by the acceptance of its charter, enter into any contract with or undertake any duty to the State to construct the whole or any portion of the works which it is authorized to construct; that such corporation may, so far as the public is concerned, decline to construct the whole of the works authorized, or after constructing a part thereof, may refuse to construct the residue, cited Y. & N. Mid. Ry. Co. v. Queen, 1 Ellis & Blackburn, 856; Rex v. Proprietors, etc., 2 W. Bl. 708; 1 Morawetz on Corporations, § 419; Re Norwegian, etc., Co., 35 Beavan, 223; Moss v. Averell, 10 N. Y. 449; Com. v. Fitchburg R. R. Co., 12 Gray, 180.

A *quasi* public corporation after it has completed works which it was authorized to construct, or partly completed the

same, may, so far as the public is concerned, refuse to use or operate such works or any part thereof, and wholly or in part abandon them, if such corporation has a valid excuse for so doing: Reg. v. Ambergate, etc., Ry. Co., 1 Ellis & Blackburn, 372 ; Com. v. Fitchburg R. R. Co., 12 Gray, 180 ; Morawetz on Private Corporations, § 1119.

If a contract of a corporation is not against public policy, the corporation may be estopped from asserting that it is *ultra vires:* Green's Brice's Ultra Vires, 36, Note a; Woodruff v. Erie R. R. Co., 93 N. Y. 609; Pomeroy on Contracts, 77; Whitney Arms Co. v. Barlow, 63 N. Y. 62.

Competition between individuals or incorporated companies may promote, or be against, public policy. It is incumbent upon the party alleging that an agreement to suppress competition is against public policy, to allege and prove facts and circumstances showing it to be such: Collins v. Locke, 4 Law Rep. App. Cas.

A corporation has implied authority to act in the same manner as a co-partnership in carrying on its legitimate business, and therefore it may enter into any contract which is reasonably adapted to further the enterprise for which it was chartered, unless it be restrained by charter or by a general law: White Water, etc. Co. v. Vallette, 21 How. 424; Old Colony R. R. Co. v. Evans, 6 Gray, 38, 39; 1 Morawetz on Private Corporations, § 362; B. & L. R. R. Co. v. S. & L. R. R. Co., 2 Gray, 32; City of Quincy v. Bull, 106 Ill. 337; People v. Mut. Gas Light Co., 38 Mich. 154; Taylor v. C. & M. Ry. Co., 2 Exc. R. 356, 384; Green's Brice's Ultra Vires, 65; Reynolds v. Stark, 5 Ohio, 205; South Wales Ry. Co. v. Redmund, 10 C. B. N. S. 675; Hare v. L. & N. W. Ry. Co., 2 J. & H. 101; Shrewsbury & B. Ry. Co. v. N. W. Ry Co., 2 Macnaghten & Gordon, 324.

Mr. JOHN N. JEWETT and Mr. MELVILLE W. FULLER, for appellant ; as to monopolies, cited State v. Telephone Co., 36 Ohio St. 296 ; Collins v. Locke, 4 L. R. App. Cas. 674 ; Sayre v. L. Un. Ben. Asso., 1 Duvall (Ky.), 143 ; Hooker v. Vandewater, 4 Denio, 349 ; Stanton v. Allen, 5 Denio, 434 ; Metzger v. Cleveland, Greenwood's Public Policy, 655.

The business of supplying illuminating gas to the city and its people, by means of pipes laid on the public highways under a grant from the State of the power so to do, is the exercise of a franchise belonging to the State, and the services rendered and to be rendered as the consideration for such grant are of a public character: Shepard v. Gaslight Co., 6 Wis. 539; N. O. Gas Co. v. La. Light Co., 115 U. S. 650; Louisville Gas Co. v. Citizens' Gas Co., 115 N. S. 683.

The contract in this case was to prevent competition between the two companies in the business for which they were organized, and in aid of which they received valuable grants and franchises from the State and is therefore void: East Anglican Ry. Co. v. Eastern Ry. Co., 7 Eng. L. & E. 505; McGregor v. Official Manager, D. & D. R. R. Co., 16 Eng. L. & E. 180; Mayor of Norwich v. Norfolk Ry. Co., 30 Eng. L. & E. 120; Tracy v. Talmadge, 14 N. Y. 163; Talmadge v. Tell, 3 Selden, 328.

The privileges granted by the State for the public convenience and benefit, can not be abandoned or relinquished to another by contract, except it be a contract authorized by the State granting the privilege, amounting in effect to a modification of the charter: State v. H. & N. H. R. R. Co., 29 Conn. 538; Thomas v. R. R. Co., 101 U. S. 71–82.

Contracts are void, if covenants in restraint of trade, as against public policy, enter into and form a part of them, and both parties are at fault in respect to such covenants: Saratoga Bk. v. King, 44 N. Y. 87; Craft v. McConoughy, 79 Ill. 346; Arnot v. P. & E. Canal Co., 66 N. Y. 558; Morris Run Coal Co. v. Coal Co., 68 Pa. St. 173; St. L., J. & C. R. R. Co. v. Mathers, 71 Ill. 592; Same v. Same, 104 Ill. 257.

Any contract which disables a public or *quasi* public corporation from performing the duty which it has undertaken, or which has been imposed upon it, for the public weal, or compels it to make the public accommodation or convenience subservient to its private interests, is void: Am. Un. Tel. Co. v. Un. Pacific R. R. Co., 1 McCrary, 188; Thomas v. R. R. Co., 101 U. S. 71; Peoria, etc., Co. v. Coul, 68 Ill. 489; Clark v. O. & S. W. R. R. Co., 4 Neb. 458; State v. Hartford & N.

H. R. R. Co., 29 Conn. 538; Bestor v. Wathem, 60 Ill. 138; St. L. J. & C. R. R. Co. v. Mathers, 71 Ill. 592; St. Jo & D. C. R. R. Co. v. Ryan, 11 Kan. 602; Linder v. Carpenter, 62 Ill. 309.

MORAN, J. The questions to be determined in this case are, 1. Was the contract set out and to compel the observance of which the bill was filed, such a one as the appellant and appellee gas companies had power to make?

2. Is said contract contrary to public policy as being in restraint of trade, or tending to create a monopoly?

3. If the contract was within the powers of the corporations to make and is valid, do the circumstances of threatened breach and consequent damage stated in the bill, present a case requiring the interposition of a court of equity to compel specific performance?

The appellant and appellee corporations were, at the time of making the contract in question, in possession of similar rights, privileges and franchises, and were subject to like public duties and obligations. The right to lay down its mains and service pipes in the streets, alleys and public places of the city was conferred on the appellee, the Chicago Gaslight and Coke Company, by the legislature without the intervention of the city council, and the same right was conferred upon the appellant, subject to the consent of the city council, and that consent had been expressed by an ordinance granting to appellant full permission and authority in that regard. If, then, appellee had full capacity to make and bind itself by the promises and covenants in the contract, appellant had capacity, in consideration thereof, to bind itself by corresponding covenants. What, then, are the powers conferred on appellee by its charter? It must be observed, at the outset, that the words of the act are permissive and not mandatory or imperative. The grant to the corporation is authority to manufacture and sell gas and the privilege of laying its pipes in the streets for the purpose of supplying the city and its inhabitants. Did the acceptance of this grant impose upon the corporation any, and if any what, obligations to the public? It has been denied

by courts of last resort in two States, that a gas company. in accepting such a charter assumes any public duty whatever. Such companies are held by the Supreme Courts of New Jersey and Connecticut to be mere manufacturing corporations, not bound to make gas or to suffer the gas they do make to be used, and under no obligation to sell to all or to any who may apply for it, or to serve the public any farther than the managers may see fit. Patterson Gaslight Co. v. Brady, 27 N. J. 245 ; Norwich Gaslight Co. v. Norwich City Gaslight Co., 25 Conn. 19 ; Norwich Gas Co. v. McCune, 30 Conn. 521.

We are inclined to the opinion, however, that the tendency of the later decisions in this country is to establish the doctrine that the manufacture and distribution of illuminating gas in towns and cities, and to the inhabitants thereof, is so related to the public comfort and convenience, that the business is of a public nature so far as to authorize the legislature to grant to corporations, created for that purpose, exclusive privileges, and to impose on corporations invested by the legislature with the franchise of laying pipes and conduits in the streets and highways and other public places, an obligation, if the right is exclusive, to supply gas to customers and the city on reasonable conditions, and possibly the obligation to extend their pipes and fixtures as fast as the reasonable needs of the public require and the ability of the corporation will permit. New Orleans Gas Co. v. Louisiana Light Co., 115 U. S. 650; Louisville Gas Co. v. Citizens' Gas Co., 115 U. S. 674; Shepard v. Milwaukee Gaslight Co., 6 Wis. 537.

But here, as we have seen, the exclusive right conferred upon the corporation had expired before the contract in question was made, and we must therefore ascertain what duties toward the public are imposed upon the corporation by its acceptance of a charter permitting it to manufacture and sell gas and lay mains and service pipes for the distribution thereof in the streets of the city. If, from its acceptance of the charter, there was an implied undertaking that it would extend its mains as rapidly as possible throughout the city, and serve the city and its inhabitants with gas—if, in other words, it was bound by its charter, as being a contract with the State to

execute to the full extent throughout the territory included within the city limits, the powers and franchises granted, then we will have little difficulty in concluding that the contract prohibiting it from executing those powers in one portion of the territory was *ultra vires* the corporation. *Quasi* public corporations, such as railroad companies, having public duties to perform, and having the right to acquire property necessary to the completion of their works by operation of the powers of eminent domain, have been held in England not to be under obligations to execute the works for which they were organized when the words of the charter were permissive and not compulsory. In the York & Midland R. R. Co. v. The Queen, 1 Ellis and Blackburn, the question was elaborately considered in the Exchequer Chamber, and the judgment of the Queen's Bench granting a mandamus to compel the completion of a line of railroad, was reversed. The act of Parliament empowered the corporation to make a line of railway between certain towns which were named in the act. The company built a portion of the line but did nothing upon the remainder of it. After pointing out that the words of the act are permissive, and not imperative, the court say: "But it is said that a railway act is a contract on the part of the company to make the line, and that the public are a party to that contract, and will be aggrieved if the contract be repudiated by the company at any time before it is acted upon. Though commonly so spoken of, railway acts, in our opinion, are not contracts, and ought not to be construed as such; they are what they profess to be, and no more; they give conditional powers which, if acted upon, carry with them duties, but which, if not acted upon, are not, either in their nature or by express words, imperative upon the companies to whom they are granted. Courts of justice ought not to depart from the plain meaning of the words used in acts of Parliament; when they do so they make, but do not construe the laws; and if it had been so intended, the statute should have required the company to make the line in express terms; indeed some railway acts are framed on that principle; and to say that there is no difference between words of requirement and words of authority when found in

such acts is simply to affirm that the legislature does not know the meaning of the commonest expressions."

So far as we have discovered, the doctrine announced in this case has never been departed from in England. Counsel for appellee cite a number of cases which, they contend, indicate that a different view of corporate obligation is taken in this country. The State v. Hartford & New Haven R. R. Co., 29 Conn. 538, is relied on to sustain this contention. In that case the company was chartered to construct and operate a railroad from Hartford to the navigable waters of New Haven harbor. After constructing the road and running trains over it for some years, it built a diverging track and discontinued the running of passenger trains to the original terminus at the tide water. A mandamus was applied for and the company set up as the only excuse for not running its passenger trains over the road as constructed to the terminus, a contract with another railroad company that it would not do so. The court held that the company was under a corporate duty to run its passenger trains, and that the contract it made not to permit the public to enjoy the benefit of part of their road amounted to nothing. This case is not an authority that a corporation will be compelled to construct the entire line described in its articles of incorporation, but rather decides that where a corporation has exercised its franchise so far as to construct its line, taking property for that purpose, it is not at liberty to refuse the public the accommodation of travel over such line. Another case is The People v. The Albany & Vermont Railroad Company, 24 N. Y. 261. The corporation was formed under the general act to construct and operate a railroad between Albany and Eagle Bridge. The road was constructed and put in operation, and after a time ceased to operate that portion of the road lying between Waterford Junction and Eagle Bridge, and with a view of abandoning that part, took up the rails and dismantled the road. A bill was filed by the attorney general to prevent the abandonment of that portion of the road and to compel the company to perform the duty of operating it. The court dismissed the bill, Wright, J., holding that the company was under no duty to

operate its road, but saying that it could not legally operate a railroad from Albany to Waterford Junction under a franchise to maintain and operate one from Albany to Eagle Bridge. A majority of the court were of the opinion that the company was not at liberty to discontinue part of its road, but was bound to operate it, but the remedy sought was not the proper one. Wright, J., delivering the principal opinion, says: "The railroad act does not, in terms, require a company organized under it to construct, maintain or operate the railway mentioned in the articles of incorporation. The act is permissive and not mandatory. The associates are endowed with power to construct and operate a railroad for the conveyance of persons and property between established points, and in this sense, to exercise a public employment. The associates, by the act of acquiring corporate existence, do not absolutely agree with the State that in consideration of such corporate existence, and the franchise with which they are invested, they will construct the railroad mentioned in the charter and continue to operate it during the corporate existence. No contract obligation is thereby created on the part of the corporation."

In Thomas v. Railroad Co., 101 U. S. 71, by a contract of lease, the railroad and all its appurtenances and franchises, including the right to do the business of a railroad and collect the proper tolls, were, for a period of twenty years, leased by the company to an individual, the corporation reserving no power of control in the management of the road, or in the exercise of the franchises of the company. The court held such contract of lease void, as forbidden by public policy, and beyond the powers of the company to make, and quotes, as stating with clearness the ground of decision, the language of the court in a case in the 17 Howard, 30, where a Pennsylvania company had committed the entire management of the road which it had built to a Maryland corporation, as follows: "But those acts involve an overturn of the relations which the charter has arranged between the corporation and the community. Important franchises were conferred upon the company to enable it to provide facilities for communication and intercourse,

required for the public convenience. Corporate management and control over these were prescribed, and corporate responsibility for their insufficiency provided as a remuneration to the community for their grant. The corporation can not absolve itself from the performance of its obligations without the consent of the legislature."

Neither of these cases, nor any of the other numerous cases cited upon this question by the counsel for the appellee, as we understand them, controvert the rule as laid down by the Exchequer Chamber in the case from which we have quoted. They do establish that a corporation can not transfer its franchises to an individual, or to another corporation ; and that where the corporation has constructed its works and entered upon the operation of them, and in so doing has exercised to the full the franchise granted, it will not be permitted to cease and abandon the operation of a part thereof, to the inconvenience of the public. As to the latter proposition there is not a perfect accord. The Supreme Court of Massachusetts has determined that a railway company was justified in refusing to run trains where it had ascertained, by a fair and careful experiment, that the amount of travel would not pay the expense. Commonwealth v. Fitchburg R. Co., 12 Gray, 180.

We can find in the adjudged cases no support for the contention that a corporation, the charter of which is permissive only and not imperative, and which is not vested with any exclusive privilege, is bound by implication arising from the acceptance of the charter to execute its franchises throughout the entire territory in which it is authorized to operate. Doubtless there are strong reasons, based upon sound considerations of public policy, which imply enlarged public duties from the exercise by corporations of great public rights, such as the exercise by a railway company of the right of eminent domain, the right to turn watercourses, bridge streams, and to cross and run upon and occupy, to the exclusion of other modes of travel, the public highways. We have seen, however, that the grant and acceptance by the company of such great public powers does not constitute a contract that the entire line of road will be built, and at most obligates the com-

pany to operate the line when it has used its powers in constructing it. What ground is there, then, for implying that a gas company, which has the comparatively unimportant right to lay its mains and service pipes in the streets of a city and supply such persons as desire it with gas, has, by accepting its charter, contracted with the State that it will lay its pipes and serve its gas throughout the entire city whenever a customer can be found who wishes to use it? We are aware of no principle which would justify such a conclusion. The appellee, at the time of making the contract in question, had no monopoly, no exclusive right. All duties, whatever they may have been, to which it was subject while such exclusive right existed and which grew out of such right, terminated with the exclusive right; and the corporation was left in the possession of rights and franchises which it was at liberty to exercise to just such an extent as it saw fit; and it was under no obligation to extend its pipes into streets not then occupied by it, or to construct its works or to supply gas in portions of the territory in which it chose not to operate. The limitation of its field of operations to a portion of the territory included within the city limits, was, within the discretion necessarily reposed in the managers of a corporation, created for such a purpose, and the fair exercise of such discretion can not be construed as an abandonment of the objects of the corporation or as a non-user of its franchises.

"A corporation may, for reasons of expediency, abandon a portion of the enterprise for which it was incorporated, provided the result be merely to contract the business within smaller limits, and not to change its character." Morawetz on Corporations; Moss v. Averill, 10 N. Y. 449; In re Norwegian Iron Co., 35 Beav. 223; Com. v. Fitchburg. If, then, appellee was free to exercise its franchises or not, in the west division, was it not free to contract that it would not exercise them there, and could it not, for instance, have bound itself by a contract with an individual who was seeking an agreement with the city to light the streets with oil lamps. that, in consideration of his confining himself to the west division, and leaving it to make its arrangements for lighting the south side

without his competition, it would not extend its works on the west side and would not compete with him in lighting the streets of that portion of the city? It seems to us that such a contract would be clearly within the scope of the company's powers, and in no manner a violation of any policy of the State that can be implied from the grant of its charter. Nor do we see that by having granted a similar charter to another company the State has imposed any new obligation upon appellee, or indicated any policy which would compel competition between appellee and such other company in the supplying of gas within the entire city. While, as counsel suggests, the practical identity of language in the grants to the two companies indicates a legislative intention to place these two gas companies upon an equality of right and to impose upon them an equality of obligations, and to enable them to carry on the same business within the same territory, we are unable to infer from these facts any policy which would forbid their entering into any reasonable arrangement which would leave one portion of the territory to be supplied by one company and another to be supplied by the other, and which would restrain each from entering upon or supplying territory set off to the other. Hare v. London & N. W. Ry. Co., 2 J. & H. 101; Shrewsbury & B. Ry. Co. v. N. W. Ry. Co., 2 Mc. & Gordon, 324. The companies were as free to enter into any arrangement not to compete with each other, or to divide territory in which to carry on their business as private persons were, and were subject to the same restrictions as to public policy and contracts in restraint of trade, and none others.

Assuming then, as we have done in the foregoing discussion, these corporations to have been engaged in a business that affected public convenience, and to be, by reason of the franchises which they enjoyed, *quasi* public corporations, their obligations required of them only to furnish to the city and its inhabitants wherever they had extended their conduits and service pipes and customers were desirous of receiving it, gas, on reasonable and equal terms and conditions. Williams v. The Mutual Gas Co., 52 Mich. 499.

We conclude, then, that the contract was one, which, from

anything expressed in the charters of the companies or to be implied from the granting of them, the companies were not forbidden to make; and that it was one entirely within the scope of the powers impliedly given to the corporations to conduct and manage their undertaking for their own profit and advantage, and the public benefit and convenience.

2.   Is the contract contrary to public policy, as being in restraint of trade or tending to create a monopoly ?

It is well settled that an agreement in general restraint of trade is contrary to public policy, illegal and void, but an agreement in partial or particular restraint upon trade has been held good, where the restraint was only partial, consideration adequate, and the restrictions reasonable.   Craft et al. v. Mc-Conoughy, 79 Ill. 346.   Says the Supreme Court of Michigan, " If, considered with reference to the situation, business, and objects of the parties, and in the light of all the surrounding circumstances with reference to which the contract was made, the restraint contracted for appears to have been for a just and honest purpose, for the protection of the legitimate interest of the party in whose favor it is imposed, reasonable as between them and not specially injurious to the public, the restraint will be held valid.   Hubbard v. Miller, 27 Mich. 15.

Where the question turns upon the reasonableness of the restriction of the party carrying on trade or business within a certain space or district, the answer may depend upon various circumstances that may be brought to bear upon it; such as the nature of the business, the populousness of the neighborhood, the mode in which the business is carried on, the outlay necessary to conduct it, and other like circumstances.   Green-hood on Public Policy, 716.

Appellee alleges in the answer that Garrison, who was at the time of the making of said contract in substantial control of the complainant corporation, and who had been actively laying mains and service pipes in the streets of the city for the purpose of competing with appellee, was a man of large means, energy and influence, and it was his intention to prosecute the works of complainant in Chicago, and as far as practicable to diminish the business of selling gas by appellee; that

said Garrison had commenced the construction of gas works in the west division and the laying of pipes in the west division and also in the south division, in some streets in which the pipes of appellee had been laid and were in use, thereby threatening serious competition with appellee. The west division at the time contained some ten square miles of territory and the south and north sides about seven square miles. The population on the south and north sides exceeded that on the west side by something over twenty thousand, and all the public buildings and all the principal business buildings were upon the south side. The west division constituted a large and sparsely populated district, requiring a large expenditure for the extension of mains, and promising but comparatively small consumption of gas and but a meager immediate return on the outlay. Having regard to all these circumstances it appears to us that the restraint imposed was reasonable; that the purpose of it was the legitimate protection, by an honest method, of the manifest interests of the parties to it, and that at the time of its execution the contract tended more to promote the public interests than to operate with any special injury to them. It very probably induced a prompt outlay in the extension of their works by each company in their respective territory, by the expectation of legitimate returns, which it created, and provided to the distant resident on a sparsely settled street the luxury of gas light, which timid capital, when subject to the threat of serious, perhaps ruinous competition, would not have been induced to furnish for years thereafter.

But it is said that the contract tended to prevent competition, and it is therefore void. It did prevent competition between the parties to it and so does every contract which is in partial restraint of trade. The purpose of such contracts always is to protect the business of one from the competition of the other, yet such contracts are not for that reason held void, where the means adopted are reasonable. The contract to prevent competition in the sale of gas between these two corporations is very different in its methods and effect from the corrupt combination to prevent all competition in the

grain market, which was condemned by the Supreme Court in Craft v. McConoughy, *supra*. There all the warehouses in the city, and every lot suitable to erect a warehouse on, were controlled by the combination, and all competition in the purchase, sale or storage of grain in the market was effectually excluded. Secret meetings were held at night at which prices were fixed, and while to the public the parties were held out as competing for business, secretly they conspired together and were working in a common cause and in the sole interest of each other. Here the agreement only prevented competition between the parties to it, and left each party, in its respective territory, open to the free competition of all other corporations or individuals who chose to embark in the business; and it appears from the answer of appellee that other organizations have been competing with it within the south and north divisions of the city.

The tendency of the courts is to regard contracts in partial restraint of competition with less disfavor than formerly, and the strictness of the ancient rule has been greatly modified by the modern cases. Maule, J., in Proctor v. Sargent, 2 Scott, N. R. 289, remarked that "Many persons who are well informed upon the subject entertain an opinion that the public would be better served if, by permitting restrictions of this kind, encouragements were held out to individuals to embark large capitals in trade, and that it would be expedient to allow parties to enter into any description of contract, for that purpose, that they might find convenient." Greenwood on Public Policy, 689, and cases cited.

True, there is not and ought not to be any disposition to sustain contracts or combinations that tend to produce a monopoly, but that is no monopoly which only secures one in the exclusive enjoyment of his business as against a single competitor, while all the world besides are left at full liberty to enter upon the same enterprise. Chappell v. Brockway, 21 Wend. 157.

The contract is not, then, void, as being in restraint of trade or tending to create a monopoly.

Are the circumstances such as to induce a court of equity

to compel specific performance? It is averred in the bill and not denied, that, induced by appellee's promise not to lay pipes or furnish gas in the west division, appellant has expended a large amount of money in extending its mains and constructing its works which it would not otherwise have done. It is also alleged and practically admitted, that appellant has faithfully kept and performed the promises of the contract on its part, and refrained from extending its pipes or furnishing gas in the north or south divisions, and that by reason thereof appellee has made and derived large profits. It is shown that the damages which will be sustained by appellant from the threatened breach of the contract by appellee, will be practically impossible of ascertainment and adequate compensation at law.

Besides the performance of the contract by appellant in the matter of refraining from competition with appellee on the territory assigned to appellee by the contract, appellee has received, as further consideration for its promises, the sum of forty thousand dollars, and the conveyance of a quantity of gas mains which appellant had laid on the south side. An attempt was made to show that the forty thousand dollars was the difference in value between the gas mains and pipes conveyed by the parties to each other, but the contract is in writing, and states that what was paid, conveyed and promised by the one party was in consideration of what was conveyed and promised by the other, and it is not admissible to apportion the consideration to different items of the undertaking, where the writing treats the consideration as a unit and entire.

We have found the contract to be one which the corporations were not forbidden to make; not against public policy, as being in restraint of trade; that a valuable consideration passed to appellee; that it had the benefit of and has profited by the contract, and that the breach thereof will cause damage which can not be adequately compensated at law. If the court does not interpose appellee will be practically secure in deliberately violating a written contract, the execution of which it admits and from the operation of which it has derived great benefit. While the specific performance of a contract

lies in the sound discretion of the court, the power is lodged in the court in order to prevent inequitable results, and will be exercised to perform a valid contract where a refusal to perform would result in manifest injustice. The power has been frequently exercised to compel the observance of contracts in restraint of trade by enjoining a breach. Thus, in Guerand v. Dandelet, 32 Md. 561, where one sold out a dyeing establishment and covenanted that he would not at any time thereafter exercise in the city of Baltimore the trade of a dyer or scourer, or compete with the vendee in said business, the court enjoined a breach, saying that the authorities fully maintain the right of a court of equity to restrain by injunction the violation of contracts of that character. So where one agreed to work as a tailor exclusively for another and not to carry on the trade of a tailor, in a certain town, he was enjoined from carrying on the trade in said town. Rolfe v. Rolfe, 15 Sim. 88. In Ropes v. Upton, 125 Mass. 258, the court enjoined the breach of an agreement not to carry on business where the agreement provided the forfeiture of $1,000, in case of breach, saying a court of equity fastens on the real contract and compels the execution of the very thing to be done. See also Fox v. Scard, 33 Beav. 327; McCall v. Braham, 16 Fed. Rep. 37.

Even if the contract is in fact *ultra vires*, it not being against public policy, not *malum in se* or *malum prohibitum*, the corporation, having received the consideration and enjoyed the benefits of the contract, could not be heard to allege the want of power to make it, to justify its refusal to observe it. It is well settled by the weight of modern decisions that a corporation can not avail of the defense of *ultra vires* where the contract has been in good faith performed by the other party to it, and the corporation has had the benefit of the contract and of the performance. Bradley v. Ballard, 55 Ill. 413; Darst v. Gale, 83 Ill. 136; Watson et al. v. Furnes Ry. Co., 9 L. R. Eq. 28.

There is a paramount public policy that controls in such cases which requires that contracts freely entered into shall be held sacred and faithfully performed, and a court of equity

will so contrive, that parties who have enjoyed the fruits of an agreement, shall not be permitted to absolve themselves from their valid obligations.

The decree of the superior court will, therefore, be reversed and the case remanded to that court with directions to enter a decree enjoining and restraining the said Chicago Gaslight and Coke Company from laying gas mains or pipes in the said west division or entering into contracts for supplying the city or the inhabitants in said west division with gas and from in any manner violating said contract.

Reversed and remanded with directions.