STATE v. NEBRASKA DISTILLING COMPANY.

[FILED MAY 28, 1890.]

</div>

1. **Ultra Vires:** UNLAWFUL ACTS: CORPORATIONS can be organized under the laws of this state for a lawful purpose only. Unlawful acts of a corporation are not limited to those which are *mala prohibita* and *malum in se*, but include powers which the corporation is not authorized to exercise, and contracts which they are not empowered to make.

2. ————: TRUSTS: CONTRACTS: CONVEYANCES. A contract in total restraint of trade in the state, and which tends to prevent competition in an article of commerce and create a monopoly

therein, is null and void, and a like rule applies to a conveyance executed for a like use, being an unlawful purpose, is therefore *ultra vires.*

3. **Lis Pendens :** ALIENATION OF DISPUTED PROPERTY. The court having jurisdiction, a party cannot, while the action is pending, dispose of the property and prevent a final judgment in the case.

4. **Corporations :** ANNULLING FRANCHISE: INTERVENORS. The franchise of a corporation being annulled, the question of the rights of property and of an intervenor therein will not be determined until all claimants can be heard.

ORIGINAL information in nature of *quo warranto.*

*William Leese, Attorney General, John C. Watson,* and *Geo. D. Scofield,* for the state, cited: *People v. Sugar Refining Co.,* 54 Hun [N. Y.], 354; *Gibbs v. Gas Co.,* 9 Sup. Ct. Rep., 553; *People v. Chicago Gas Co.,* 130 Ill., 268 [7 Ry. & Corp., L. J., 23]; Cook, Trusts, p. 28; Morawetz, Priv. Corp., 376, 421, 656; *Neustadt v. Hall,* 58 Ill., 172; *Craft v. McConoughy,* 79 Ill., 346; *Messenger v. R. Co.,* 36 N. J. L., 413; Angell & Ames, Corp., 227; Taylor, Corp., 305, 419, 421; Green's Brice's Ultra Vires, 416; *Chicago L. Ins. Co. v. Needles,* 113 U. S., 574 [5 Sup. Ct. Rep., 681]; *People v. Dispensary,* 7 Lans. [N. Y.], 306; *People v. R. Co.,* 27 Barb. [N. Y.], 445; *Hutchins v. Masterson,* 46 Tex., 554; *Richardson v. Buhl,* 43 N. W. Rep. [Mich.], 1102; *Franklin Co. v. Lewiston Sav. Inst.,* 68 Me., 43; *Franklin Bk. v. Bank,* 36 O. St., 350; *Sumner v. Marcy,* 3 Woodb. & M. [U. S.], 105; *Mutual, etc., Ass'n v. Agency Co.,* 24 Conn., 159; *Cent. R. Co. v. Collins,* 40 Ga., 582; *Berry v. Yates,* 24 Barb. [N. Y.], 199.

*Lake & Hamilton,* and *Ambrose & Duffie,* for defendant Distilling Company, cited: Cooley, Const. Lim., 393\*; 4 *Political Science Quarterly,* 316; " Facts About Trusts," (Beach), *Forum,* Sept., 1889; " Railway Federation," etc., *Ry. & Corp. Law Journal,* July, 1889; 10 *Andover Re-*

*view*, 109; 5 *Forum*, 384; "Trusts" (Carnegie), *N. Am. Review*, Feb., 1889, p. 141.

*Edwin F. Warren*, for George L. Woolsey, intervenor.

MAXWELL, J.

This is an action of *quo warranto* brought in this court to obtain a forfeiture of the defendant's corporate franchise. One Woolsey was permitted to intervene in the case.    An answer was filed by the defendants and the cause referred to Judge Pound to take the testimony and find the issues of facts, and who made a report as follows :

"First—That the defendant, said Distilling Company, at and prior to the commencement of this suit, was a corporation duly organized under the laws of the state of Nebraska for the purpose of the manufacture and sale of alcohol, spirits, and other liquors, and the transaction of all business pertaining thereto.

"Second—That the certificate of incorporation of said company was filed in the office of the secretary of state of the state of Nebraska on or about the 25th day of March, 1886, and was filed for record in the county clerk's office of said county of Otoe on the 26th day of March, 1886, and recorded in book 26 of Miscellaneous Records of said office on page 267.    That the corporate name of said company was 'The Nebraska Distilling Company,' and the place for transacting its business at Nebraska City, Nebraska ; that by the terms of the articles of incorporation the corporation was to commence on the 26th day of March, 1886, and continue for the term of twenty years and terminate on the 26th day of March, 1906, unless renewed or sooner dissolved by a vote of two-thirds of the capital stock ; that the stockholders of said corporation were to elect five of their members directors, who should constitute the board of directors of said corporation, and

the directors were to elect one of their number president, one of their number vice-president, one of their number secretary, one of their number treasurer of said corporation, and the business of said company was to be transacted by the president, secretary, and treasurer, subject to the general control and management of the affairs of the corporation by the board of directors; that the amount of capital stock to be subscribed was $100,000, divided into 1,000 shares of $100 each.

"Third—That the intervenor, George L. Woolsey, was the president of said company from March, 1886, to the 19th day of December, 1887, and from the last named date to the 15th of January, 1890, he was the secretary and treasurer of said company. That on and prior to this 19th day of December, 1887, the stock of said company was owned as follows: D. T. Mills & Co. owned 745 shares, George L. Woolsey owned 250 shares, Harry D. Wilson, H. P. Stearns, Dexter T. Mills, W. W. Coolidge, and Erastus C. Gaffield owned one share each. That said company owned and operated a distillery at Nebraska City and certain lands on which the same was situated, and carried on the business of the manufacture and sale of alcohol, spirits, and other liquors, and transacted all business pertaining thereto from about the time of its organization until on or about said 19th day of December, 1887, and during that time the company employed from fifty to sixty hands in operating the distillery, which consumes about 600 bushels of corn and produced about 2,700 gallons of alcohol, spirits, and liquors per day, and yielded a large profit to the company.

"Fourth—That in the year 1887, and prior to the month of December, Joseph B. Greenhut, Adolph Woolner, Alfred Bevis, W. H. Corning, Lewis H. Green, Wm. N. Hobart, George K. Duckworth, John H. Francis, and P. J. Hennessy, each of whom owned or had an interest in one or more distilleries located north and west of the Ohio river,

in the United States, formed an unincorporated association known as and called 'The Distillers' and Cattle Feeders' Trust,' with its headquarters at Peoria, in the state of Illinois, the object and purpose of which association or trust were to control and restrict the production of high wines alcohol, spirits, and other liquors, and to regulate and fix the prices of such productions in the markets of the United States, and to prevent competition in the manufacture and sale of such wines, alcohol, spirits, and liquors.

"Fifth—The object and purpose of the trust are accomplished by its getting the control and management of as many distilleries as possible, and the mode of procedure is as follows: An arrangement or agreement is made by which the company is to transfer its capital stock to the trustees of the Distillers' and Cattle Feeders' Trust, for which said trustees are to issue certificates of the trust. The real estate upon which the distillery plant is situated is deeded to some one member of the company as trustee for the stockholders, and the trustee then leases said real estate to the company for the term of twenty-five years. The capital stock of the company is canceled and new stock issued to said nine trustees of the trust, for which the trustees give the agreed amount of certificates of the trust. The board of directors of the company resign and a new board elected, a majority of whom are taken from the nine trustees of the trust.

"Sixth—That prior to the formation of said trust, various distillers had formed what is called pools, the object of which was to prevent an over-production of alcohol, spirits, and liquors. In the absence of such a combination there was a tendency to over-production and to furnish a supply beyond the demands, the consequence of which was to lower the price of the production and make the business unprofitable. Owing to an inherent infirmity in the pooling system, it failed to accomplish its full purpose, and as a substitute therefor said trust was formed. The trustees

of the trust have almost unlimited power and control over all distilleries that enter it. They can limit their production or suspend their operation altogether. From ninety to one hundred and ten distilleries are located north and west of the Ohio river, of which number about seventy-five or eighty have entered the trust, and of the number under the control of the trust about fourteen are kept running. The trustees confine the production of the distilleries under their control to the large houses situated in favorable localities, which can be run at less expense than small houses located in unfavorable places; of the distillery plants in actual operation, about six are located in Peoria, the headquarters of the trust. That the corporate stock assigned and transferred to said trustees is owned and held by them in common and they acquire thereby the rights and powers of shareholders and exercise full control and direction of the action, management, and business of the companies whose stock has been so assigned and transferred to them as afore-said, and they are enabled thereby to regulate, and do to a great extent regulate, at will the production and price of alcohol, spirits, and other liquors in the state of Nebraska, and in the United States. The said trustees can, and do, at will restrict and limit the production and supply of alcohol, spirits, and other liquors and thereby enhance their value.

"Seventh—That in the month of December, 1887, said Joseph B. Greenhut, Adolph Woolner, and Alfred Bevis, as the officers and representatives of said Distillers' and Cattle Feeders' Trust, came to Nebraska City in pursuance of some prior negotiation, understanding, or arrangement with the defendant, or some of its officers or representatives, and after said three trustees had examined the distillery plant, the building and machinery belonging thereto, a schedule of its property, including material on hand, being of the value of about $20,000, and the books of the company showing the amount of business it had done and

45

was doing, and after they had appraised all of said property, including the good will of the business, exclusive of the lands on which the buildings were situated, all of which property, exclusive of said lands, they estimated to be of the value of $100,000, it was agreed by and between said three trustees so acting for said trust and said Distilling Company that said company should assign and transfer its capital stock or new stock in lieu thereof to said nine trustees, and that said trustees should issue and deliver to the stockholders of the Distilling Company certificates of the Distillers' and Cattle Feeders' Trust of the face value of $285,700 in payment of said capital stock; that the real estate of the company should be deeded to said Gaffield in trust for the stockholders of the company, and that Gaffield, as trustee, should lease said real estate to the company for twenty-five years; that said George L. Woolsey should receive a salary of $3,500 a year for the period of five years; that said real estate should be estimated of the value of $40,000, six per cent of which, being the sum of $2,400, should be the rental value of said real estate per annum, to be paid by the Distilling Company to said Gaffield as such trustee, and that the company should also pay the taxes on said real estate during the term of the lease.

" Eighth—That in pursuance of said agreement, and under the direction of said trustees, the Nebraska Distilling Company conveyed the following described real estate, to-wit: all of block one (1), block eighty-four (84), block one hundred and eighty-two (182), and lots one (1) and two (2) in block two (2) in Nebraska City proper, also lots one (1), two (2), and three (3) in block G, Kearney addition to Nebraska City, all in Otoe county, Nebraska, reserving the building and machinery situated thereon, to Erastus C. Gaffield, one of the stockholders of said company, in trust for the stockholders of the company, as will appear by exhibit 'B;' that thereupon the stock of the Nebraska Distilling

Company was all canceled; that then the board of directors of said Distilling Company resigned, and a new board, consisting of said Alfred Bevis, John H. Francis, P. J. Hennessy, George L. Woolsey, and Harry D. Wilson, were elected a board of directors of said Distilling Company; that thereupon said new board of directors issued new stock to the amount of $100,000 and delivered the same to said nine trustees of the 'Distillers' and Cattle Feeders' Trust,' except one share was issued to Woolsey, and one to Wilson, who immediately indorsed and delivered the same to said trustees, Woolsey and Wilson still appearing as stockholders on the books of the company, in order that they might be eligible to membership on the board of directors of the Distilling Company; that thereupon said Erastus C. Gaffield as trustee of the former stockholders of said company as aforesaid, leased to the Nebraska Distilling Company, without the buildings and distillery establishment upon the same, the real estate above described for the term of twenty-five years, the company agreeing to pay therefor as rent $2,400 per year, for the term of the lease, to be paid quarterly.

"Ninth—That the foregoing transactions between the trustees of the trust and the Distilling Company were completed on the 19th day of December, 1887, and that said Distilling Company continued business until about the first of July, 1888, at which time, by orders and direction of said trustees, it was closed and wholly ceased to do any business.

"Tenth—That since the 19th day of September, 1887, said trustees of the Distillers' and Cattle Feeders' Trust have paid said George L. Woolsey an annual salary of $3,500, and have also paid $2,400 per annum as rent for said real estate, and the taxes on the same, amounting to $400 a year, and $600 a year for the services of a watchman at the Nebraska distillery.

"Eleventh—That since said Nebraska distillery ceased

to do business, on or about July 1, 1888, said Woolsey has transacted no business and has had no business to transact for said Distilling Company as an officer thereof or otherwise, but ever since that date he has received an annual salary of $3,500 in manner aforesaid.

"Twelfth—That said George L. Woolsey received from said trustees for his stock in the Distilling Company certificates of said Distillers and Cattle Feeders Trust, which certificates he afterwards sold and transferred, and received therefor the sum of about $30,000, which sum, nor any part thereof, he has never returned to said trustees, nor to any of them.

"Thirteenth—That on or about the 15th day of January, 1890, at Peoria, in the state of Illinois, at a meeting of the directors and stockholders of the Nebraska Distilling Company, the following resolution was adopted by a unanimous vote of the directors and shareholders to-wit: 'Resolved, By the stockholders now here present, representing all of the outstanding stock of said corporation, that the board of directors of the Nebraska Distilling Company be and they are hereby authorized and empowered to sell, assign, transfer, and deliver for a valuable consideration, all of the personal property of this corporation, including all buildings and machinery, fixtures and materials of every kind, quality, and description, in whatever state and condition, located upon the following tracts of land and situated in Otoe county, in the state of Nebraska, to-wit: All of block one (1), all of block eight-four (84), all of block one hundred and eighty-two (182) and lots one (1) and two (2), in block two (2) in Nebraska City proper, in Otoe county and state of Nebraska; also lots one (1), two (2), and three (3), in block G, in Kearney addition to Nebraska City, Otoe county, and state of Nebraska; and the said board of directors are hereby authorized and empowered to provide for the proper execution and delivery of legal bill of sale for said property and leasehold inter-

est, and the assignment of the lease in such manner as they may deem advisable, and they are also hereby further authorized and empowered by the stockholders, so soon as the transfer of said property is made according to the directors hereof; to surrender and cancel all of the stock now outstanding, and to dissolve said corporation, and to notify the secretary of state of the state of Nebraska to such effect.

"Fourteenth—That afterwards and on the 17th day of January, 1890, at Peoria, aforesaid, at an adjourned meeting of the directors of the Nebraska Distilling Company, the following resolution was adopted, to-wit : *'Be it resolved,* By the board of directors here assembled, that the president be and he is hereby authorized and empowered to sell all of said property for a sum not less than $10,000 to Weston Arnold, and to make, execute, and deliver all necessary papers for that purpose, and also to sell and assign the lease and leasehold interest in the real estate on which said personal property is situated; and further, that he be also and he is hereby authorized and empowered to make the sale and delivery of the property as aforesaid, to cancel all of the stock now outstanding of the said Nebraska Distilling Company, and surrender the charter to the state of Nebraska, which acts as president shall be attested by the secretary with the seal of the company attached.'

"Fifteenth—That afterwards, and on the 17th day of January, 1890, Peter J. Hennessy, as president of said Distilling Company, executed a conveyance to one Weston Arnold, conveying to the said Weston, without restrictions or conditions, all of the property of every kind and description of the Nebraska Distilling Company, and also assigned the leasehold interest of said company in the real estate covered by said building.

"Sixteenth—That on the 23d day of January, 1890, the said Weston Arnold assigned to the said George L. Woolsey the lease and leasehold interest aforesaid, and conveyed to the said George L. Woolsey all of the property, includ-

ing all of the buildings and all of the machinery owned by said Nebraska Distilling Company, with certain reservations and upon certain conditions, to-wit: Excepting two upright cookers, one horizontal cooker, one No. 6 Deane mash pump, all copper and iron and pipe, mash coolers, all copper worms, one small Knowles' water pump, one beer still, worms, condensers, and all connections, all other copper pipes, and all iron, brass and copper fixtures in said distillery, one vacuum pump, one beer pump, and all whisky pumps.

"Seventeenth—The conditions referred to being as follows: 'Upon the express condition that the said George L. Woolsey shall not use said property, or any of it, or permit it to be used, by himself, his heirs or assigns, for distilling purposes during the period provided for in the lease to the Nebraska Distilling Company, and the said George L. Woolsey, for himself, his heirs, administrators, and assigns, as a part of the consideration for the sale to him of the aforesaid property, hereby agrees that said property shall not be used, or any part thereof, for a distillery, or for distilling purposes of any nature or kind during the period of the original lease to the Nebraska Distilling Company. He further agrees, and binds himself, his heirs, administrators, and assigns, in case said property should at any time be so used, that the same shall revert to and become the property of the said Weston Arnold, and that immediate possession may be taken of said property on the breach of the condition herein named. And the said George L. Woolsey hereby agrees and binds himself, that in case he sells said property, or leases the same, to do so with the condition herein attached, that it shall not at any time be used for distilling purposes, and in case it is so used, that the said Weston Arnold, his heirs, administrators, and assigns, may enter into and take possession of the same in whosesoever possession it may be at the time.

"Eighteenth—That the sole consideration for the transfer of all of said property by the said Nebraska Distilling Company to the said George L. Woolsey moved from the said George L. Woolsey to the said Distilling Company, and that the said Weston Arnold paid nothing for the conveyance to him thereof, nor received anything on his conveyance of the same to the said George L. Woolsey.

"Nineteenth—That in case said machinery, fixtures, pipes, stills, and other personal property are removed from said premises, the same will be and become wholly useless for distilling purposes. That said coolers, cookers, pumps, stills, worms, condensers, alcohol columns, pipes, are attached to said building and premises and that the same cannot be removed without destroying said premises and distilling plant as a distillery, nor without considerable damage to said buildings and premises. That the said George L. Woolsey was in the receipt of a salary from the said Distilling Company paid to him by said trust in the amount of $3,500 per annum, for the period of five years from December 19, 1887; that said salary was to be paid him whether said distillery was in operation or not.

"Twentieth—That the consideration paid by the said George L. Woolsey for the transfer to him of said property was the surrender of such salary contract; the assumption by the said George L. Woolsey of the ground rent reserved in the lease thereof by the said Gaffield as trustee, as aforesaid, to-wit: $2,400 per annum for the period of twenty-three years from December 19, 1887, the payment of all taxes and other assessments upon said property, and all other incidental expenses connected therewith.

"Twenty-first—That the said George L. Woolsey could not have purchased said distilling property until he complied with the conditions and reservations mentioned in the bill of sale from the said Weston Arnold.

"Twenty-second—That the said Weston Arnold, in all that he did in receiving and transferring the property con-

veyed to him by the Nebraska Distilling Company, acted under the directions of and in pursuance of the instructions of the nine trustees of the Distillers' and Cattle Feeders' Trust.

"Twenty-third—That the conditions inserted in the conveyance by said Weston Arnold to said George L. Woolsey, as aforesaid, were for the purpose of rendering the distillery property useless for distilling purposes, and that the reservation of said property in the bill of sale was made for the purpose of destroying said distilling plant as a distillery, and to prevent the use thereof for the manufacture and sale of alcohol, spirits, and other liquors.

"Twenty-fourth—That said lease was transferred and the bill of sale made by the Distilling Company to Weston Arnold, and by him to Woolsey, in order that there might be a vendor or trustee in existence who could enforce the terms and conditions contained in the assignment of the lease and in the bill of sale. That said Woolsey canceled and surrendered his contract for a salary on the 15th day of January, 1890, and he did not then know that the board of directors intended to transfer said lease, or to make the bill of sale to said Arnold.

"Twenty-fifth—That at the meetings of the Nebraska Distilling Company on the 15th and 17th days of January, 1890, said Woolsey represented that he wished to purchase the Nebraska distillery to use as and for a cereal mill to manufacture cereal products, and at those meetings it was talked and understood by and between Woolsey and the members of the board of directors of the Distilling Company that the articles mentioned should be reserved in the bill of sale to him, and that a list of the articles to be reserved was made out with his knowledge and in his presence, and that the articles of property contained in said list are the same articles reserved in the bill of sale made by Weston Arnold to said Woolsey.

"Twenty-sixth—That the trustees of the trust did not

call, nor were they promoters of, the meeting in Chicago, designated as the Fairbanks meeting. That meeting was composed of the owners of distilleries not connected with the trust.

"Twenty-seventh—That in February, 1890, said Distillers' and Cattle Feeders' Trust became incorporated under the laws of the state of Illinois, with a capital stock of $35,000,000.

"Twenty-eighth—That since the commencement of this action, and on or about the 4th day of February, 1890, the said trustees of said trust sent its agents to Nebraska City to remove from the buildings of said Nebraska distillery the articles of property mentioned as reserved in the bill of sale made by Weston Arnold to said George L. Woolsey.

"Twenty-ninth—That the Willow Springs Distilling Company of Omaha is and was, at all times mentioned in the petition, engaged in the manufacture of alcohol, spirits, and other liquors, and that said Willow Springs Distilling Company and the defendant company herein were the only distilling companies in the state of Nebraska, and that said Willow Springs Distillery has also entered said trust, and the former owner and present manager thereof receives from said trust an annual salary.

"Thirtieth—That a considerable number of distilleries that have entered the trust have been dismantled and rendered worthless as distilleries.

"Thirty-first—That when all the distilleries located north and west of the Ohio river are run to their full capacity there is an over-production of alcohol, spirits, and other liquors, which reduces the price thereof to an extent that many of the distilleries cannot be operated without a loss to the owners thereof.

"Thirty-second—That the Nebraska Distilling Company and the officers and stockholders thereof, including George L. Woolsey, in transferring said Nebraska dis-

tillery to said trust, acted voluntarily, and such transfer was made with the consent and approval of said Woolsey, and he took an active part in effecting such transfer.

"Thirty-third—That at the time of such transfer said Woolsey expected said distillery would run, but that said trustees made no agreement or promise that the distillery should continue in operation any definite length of time.

"Thirty-fourth—That at the time the stock of George L. Woolsey in the Distilling Company, being 250 shares, was transferred to said Distillers' and Cattle Feeders' Trust, on the 19th day of December, 1887, he got full value therefor in the certificates of said trust, issued and delivered to him; that said certificates of the trust were worth from forty to sixty cents on the dollar of their face value.

"Thirty-fifth—That prior to the time said Nebraska distillery was placed under the control of the trust, it yielded a large profit, a fact from which it would be reasonable to conclude that the distillery might have continued to be run under lik : circumstances with a like result."

Section 123 of chapter 16, Comp. Stats., provides that "Any number of persons may be associated and incorporated for the transaction of any lawful business," etc. It is also provided in chapter 15 that "So much of the common law of England as is applicable, and not inconsistent with the constitution of the United States, with the organic law of this territory, or with any law passed or to be passed by the legislature of this territory, is adopted and declared to be law within said territory." These provisions of statute were passed before the admission of the state into the Union and have continued in force ever since. A corporation therefore can only be organized under our laws for a lawful purpose, and any acts done by such corporation for the accomplishment of a purpose not lawful is unauthorized, in excess of its powers, and therefore illegal and void. The acts of a corporation, to be unlawful need not necessarily be *mala prohibita* or *malum in se*, although such

acts are illegal in all cases, but any act of a corporation which by the terms of its charter it is not authorized to do, is in excess of its powers and therefore unlawful.

Contracts in total restraint of trade, as that a person shall not carry on his business anywhere in the state, are void, no matter what the consideration may be, because the effect of such contract must be injurious to the public. The early cases in regard to contracts in restraint of trade were reviewed by Parker, Ch. J., in *Mitchel v. Reynolds,* 1 P. Wm.'s, 181, decided in 1711, and it was held, in effect, that contracts in total restraint of trade were void, and that contracts in partial restraint of trade were also void, unless there was a sufficient consideration and a good reason for entering into the contract.   In *Horner v. Ashford,* 3 Bing., 322, contracts in total restraint of trade were held to be void.   To the same effect are *Homer v. Graves,* 7 Bing., 735; *Hayward v. Young,* 2 Chitty R., 407.   These cases have generally been followed in this country.  A well considered case on this subject is *Lange v. Werk,* 2 O. St., 520, in which it was held that before such contract can be enforced it must appear by the pleadings and proofs that the restraint is partial, that it is reasonable, and founded on a good consideration, and this seems to be the law at the present time. (*Lawrence v. Kidder,* 10 Barb., 641; *Pierce v. Fuller,* 8 Mass., 223; *Palmer v. Stebbins,* 3 Pick., 188; *Whitney v. Slayton,* 40 Me., 231; *Nobles v. Bates,* 7 Cow., 307; *Duffy v. Shockey,* 11 Ind., 71; *Bowser v. Bliss,* 7 Blackf., 344; *Beard v. Dennis,* 6 Ind., 204; *Chappel v. Brockway,* 21 Wend., 158.)

Whatever tends to destroy competition and create a monopoly is contrary to public policy and therefore unlawful. (*Coal Co. v. Coal Co.,* 68 Pa. St., 173; *Craft v. McConnoughy,* 79 Ill., 346; *Railroad Company v. Collins,* 40 Ga., 582; *Hazelhurst v. Railroad Co.,* 43 Id., 13; *Trans. Co. v. Pipe Line Co.,* 22 W. Va., 600; *People v. C. G. & T. Co.,* 22 N. E. Rep., 798; *Richardson v. Buhl,* 43 N. W. Rep.,

1102.) In the latter case it was held that a contract in furtherance of a monopoly and growing out of transactions in connection therewith, is against public policy, and although the question was not raised by the parties, yet the court on its own motion took notice of its illegal character and held it void. It is said "The organization is a manufacturing company. The business in which it is engaged is making friction matches. Its articles provide for the aggregation of an enormous amount of capital, sufficient to buy up and absorb all of that kind of business done in the United States and Canada, to prevent any other person or corporation from engaging in or carrying on the same, thereby preventing all competition in the sale of the article manufactured. This is the mode of conducting the business and the manner of carrying it on. The sole object of the corporation is to make money, by having it in its power to raise the price of the article, or diminish the quantity to be made and used at its pleasure. Thus both the supply of the article and the price thereof are made to depend upon the action of a half dozen individuals, more or less, to satisfy their cupidity and avarice, who may happen to have the controlling interest in this corporation, an artificial person, governed by a single motive or purpose, which is to accumulate money regardless of the wants or necessities of over 60,000,000 of people. The article thus completely under their control for the last fifty years has come to be regarded as one of necessity, not only in every household in the land, but one of daily use by almost every individual in the country. It is difficult to conceive of a monopoly which can affect a greater number of people, or one more extensive in its effect on the country, than that of the Diamond Match Company. It was to aid that company in its purposes and in carrying out its object that the contract in this case was made between these parties, and which we are now asked to aid in enforcing. Monopoly in trade, or in any kind of business in this country, is

odious to our form of government.   It is sometimes per-
mitted to aid the government in carrying on a great public
enterprise, or public work under governmental control in
the interest of the public.   Its tendency is, however, de-
structive of free institutions, and repugnant to the instincts
of a free people, and contrary to the whole scope and spirit
of the federal constitution, and is not allowed to exist un-
der express provision in several of our state constitutions.
Indeed it is doubtful if free government can long exist in
a country where such enormous amounts of money are ac-
cumulated in the vaults of corporations, to be used at dis-
cretion in controlling the property and business of the
country against the interest of the public and that of the
people for the personal gain and aggrandizement of a few
individuals.   It is always destructive of individual rights,
and of that free competition which is the life of business,
and it revives and perpetuates one of the great evils which
it was the object of the framers of our form of government
to eradicate and prevent.   It is alike destructive to both
individual enterprise and individual prosperity, whether
conferred upon corporations or individuals, and therefore
public policy is, and ought to be, as well as public sentiment,
against it.   All combinations among persons or corpora-
tions for the purpose of raising or controlling the prices of
merchandise, or of the necessaries of life, are monopolies,
and intolerable, and ought to receive the condemnation of
all courts."

In *Salt Co. v. Guthrie*, 35 O. S., 666, it is said : "Public
policy unquestionably favors competition in trade to the
end that its commodities may be afforded to the consumer
as cheaply as possible, and is opposed to monopolies which
tend to advance market prices to the injury of the general
public," etc.

In *Navigation Co. v. Railway Co.*, 130 U. S., 1, the su-
preme court of the United States, in speaking of the proper
construction of articles of association of corporations or-

ganized under general laws, says: "We have to consider, when such articles became the subject of construction, that they are, in a sense, *ex parte*. Their formation and execution—what shall be put into them, as well as what shall be left out—do not take place under the supervision of any official authority whatever. They are the production of private citizens, gotten up in the interest of the parties who propose to become corporators, and stimulated by their zeal for the personal advantage of the parties concerned rather than the general good. * * * These articles, which necessarily assume, by the sole actions of the corporators, enormous powers, many of which have been heretofore considered of a public character, sometimes affecting the interests of the public very largely and very seriously, do not commend themselves to the judicial mind as a class of instruments requiring or justifying any very liberal construction. Where the question is whether they conform to the authority given by statute in regard to corporate organizations, it is always to be determined upon just construction of the powers granted therein, with a due regard for all the other laws of the state upon that subject. * * * The manner in which these powers shall be exercised, and their subjection to the general laws of the state, and its general principles of public policy, are not in any sense enlarged by inserting in the articles of association the authority to depart therefrom."

This we think is a correct construction of the law relating to such articles and we adopt the same. Alcohol is an article of commerce. It is applied to a thousand uses in arts and manufactures. The amount which is rectified and used as intoxicating drinks forms but a very small part of the quantity actually distilled, and being an article of commerce, any contract creating a monopoly therein is against public policy and void. A corporation can exercise no powers except such as are granted to it, by the charter under which it exists. (*Thomas v. R. Co.*

101 U. S., 71; *O. Ry. Co. v. O. Ry. Co.*, 130 Id., 1.)   It is no part of the powers of the Distilling Company to sell all its property, real and personal, together with its franchises and powers necessary to properly carry on the business. (*O. Ry. Co. v. O. Ry. Co., supra.*)   The fact that the corporation has authority to put an end to its existence by a vote of a majority of its stockholders, in which event it may proceed to settle up its affairs, dispose of its property, and divide its capital stock and surrender its charter to the state, does not authorize it to terminate its existence by a sale and disposal of all its property and rights. (*Id.*)

The findings in this case, to which no objection is made, clearly show that the object of the Distilling Company in entering into the illegal combination was to destroy competition and create a monopoly, not only by limiting the production of alcohol, but by dismantling as many distilleries as the trust saw fit, absolutely prevent the manufacture of the article except in the few establishments controlled by the trust, and thus it would be enabled to control prices, prevent production, and create a monopoly of the most offensive character.   Any contract entered into with such an object in view is, under the laws of this state, null and void, and the conveyance from the Distilling Company to the trust was in contravention of the authority conferred by the statutes on that company in excess of the powers granted by its charter, and against public policy and void, and no title passed by such conveyance.   Since the bringing of this action the trust has endeavored to transfer the title of the property, and its attorney, after making an elaborate and able argument in its favor in this court, announced that he withdrew from the case.   The court, however, cannot permit the trust thus to evade the law. If it can dismantle the property it will, in part, at least, have accomplished its illegal purpose.   The property is within the jurisdiction of the court, and it is the duty of the court to make such disposition of it as the ends of justice

may require.   As there has been an abuse of the corporate franchise it will be dissolved and annulled.   As to the disposition of the property and the right of Woolsey in the premises the court is not entirely clear and will hear further argument before making a final decree in the case, the injunction, in the meantime, continuing in full force. The act of 1889, in relation to trusts, has not been referred to, and its application to this case will be further considered.

JUDGMENT ACCORDINGLY.

THE other judges concur.