STATE, EX REL. ORA S. SPILLMAN, ATTORNEY GENERAL, APPELLEE, V. BRICTSON MANUFACTURING COMPANY, APPELLANT. *

FILED SEPTEMBER 29, 1925.    No. 24140.

1. Corporations: OUSTER. When a foreign corporation licensed to do business in Nebraska violates the law or fixed policy of the state, it may be ousted therefrom in an action of *quo warranto* by the attorney general in the name of the state.

2. ———: ———. Evidence examined, and *held* sufficient to sustain the judgment in so far as it ousted the respondent from the state.

3. ———: QUO WARRANTO: EXTENT OF REMEDY. In an action in *quo warranto* by the state against a foreign corporation authorized to do business therein, to oust such corporation and to wind up its affairs in this state, the court has no power to wind up the affairs of the corporation nor to decree a distribution of its assets in the state among its stockholders, when the testimony fails to disclose that there are creditors of the corporation. In such an action a stockholder as such is not to be considered a creditor of the corporation.

4. ———: DISTRIBUTION OF ASSETS. Evidence examined, and *held* insufficient to sustain the judgment decreeing a distribution of the assets of the corporation among its creditors and stockholders.

5. ———: ———. Sections 9295, 9298, Comp. St. 1922, are applicable only to cases where a distribution of the assets of a corporation has been properly decreed.

APPEAL from the district court for ˌDouglas county: JAMES M. FITZGERALD, JUDGE. *Affirmed in part, and reversed in part.*

*M. E. Culhane* and *Weaver & Giller,* for appellant.

* Modified. See opinion, 114 Neb. p. ˉ3ˈ4ˈ/ˉ. (ˈˈ/ˈˈ ˈˈ

*Ora S. Spillman, Attorney General,* and *T. J. McGuire, contra.*

Heard before MORRISSEY, C. J., ROSE, DAY, GOOD and THOMPSON, JJ.

DAY, J.

This is an action in *quo warranto* brought by the attorney general to oust the Brictson Manufacturing Company, a South Dakota corporation, from doing business in this state. The relator also prayed that the affairs of the corporation in this state be wound up and its assets distributed among its creditors and stockholders. The trial court found generally in favor of the relator, decreed that the respondent be ousted from the state, and that its affairs therein be wound up. Three trustees were appointed to take charge of the property and assets of the corporation within the state, and directed to pay its liabilities and to divide the surplus among the stockholders and creditors. The order further directed that the trustees publish in one or more daily newspapers in South Dakota, Iowa, and Nebraska, a notice directing all persons having claims against the corporation, either as creditors, stockholders, or otherwise, to file their claims with the court for allowance or rejection on or before April 15, 1924. From this decree respondent has appealed.

The petition was based upon the theory that the corporation was organized for the purpose of defrauding those who might become stockholders; that the license to sell its stock in this state was procured by false and fraudulent statements made to the state railway commission concerning its assets and the extent of the business; that it had violated the laws of this state by fraudulently paying dividends to its stockholders which it had not earned; that it was conducting a small and unprofitable business for the purpose of keeping the charter alive, but in reality had ceased to perform the functions for which it was organized; that the capital stock and assets had been depleted by the fraudulent payment of purported dividends, and were being

State, ex rel. Spillman, v. Brictson Mfg. Co.

further depleted by the payment of exorbitant salaries and expenses in conducting the business.

The answer of the respondent, among other things, denied all allegations of fraud, denied that it had paid dividends out of its capital stock, and pleaded that the matters now sought to be litigated, in so far as they pertain to the winding up of the affairs of the corporation, had been adjudicated in the case of *Brictson Mfg. Co. v. Close*, 280 Fed. 297.

The record shows that for some years prior to November, 1916, O. A. Brictson, under the trade name of the Brictson Manufacturing Company, had been engaged in manufacturing and selling at Brookings, South Dakota, automobile tires which he designated the Brictson tire. The distinguishing feature of the tire was a device for which he received United States letters patent, and, generally speaking, consisted of a chrome leather sheath or covering placed around the tire, through which metal rivets, arranged in irregular rows, were placed so that the exposed ends of the rivets would form the tread of the tire. The purpose of this device was to prevent puncture, skidding, and wear of the tire. From a small beginning the business had grown to considerable proportions, the annual sales ranging from $80,000 to $100,000. In conducting the business, Brictson would purchase ordinary automobile tires and attach thereto his device which he manufactured.

On November 4, 1916, Brictson and others who joined him organized a corporation under the laws of South Dakota, which they named the Brictson Manufacturing Company. The articles of incorporation, as amended, fixed the capital stock at $5,000,000, divided into 50,000 shares of $100 each, of which 40,000 shares were common stock and 10,000 shares preferred stock. The articles designated Brookings, South Dakota, as the principle place of transacting its business, but also provided that other business offices might be located in other cities, among them, Omaha, Nebraska. Thirty-nine shares of preferred stock were issued, and officers and directors of the corporation elected.

On January 17, 1917, the board of directors authorized the making of a contract between the corporation and O. A. Brictson, whereby the corporation issued to Brictson 40,000 shares of the common stock and 1,000 shares of preferred stock, and also paid to Brictson $2,200 in cash. Brictson immediately donated back to the corporation 8,000 shares of the common stock and 250 shares of the preferred stock. In consideration of the above, Brictson transferred to the corporation the exclusive privilege of using his patent, the good-will of his business, and trade-name, together with his office and factory equipment, stock on hand and accounts receivable. The contract also provided that Brictson was to be employed as manager of the corporation at a salary of not less than $7,500 for the first year, and not less than $10,000 a year thereafter.

About January 20, 1917, the corporation applied to the Nebraska state railway commission, the department of the state then having the administration of the "Blue Sky" laws, for authority to sell its stock to the public in the state of Nebraska. A similar application was also made to the proper authorities in South Dakota and Iowa. On December 11, 1917, the corporation filed a proper application with the secretary of state for permission to transact business in this state as a foreign corporation, which was granted. In its application to the Nebraska state railway commission, the corporation stated, among other things, that it was organized under the laws of the state of South Dakota, with a capital stock of $5,000,000, divided into 40,000 shares of common stock and 10,000 shares of preferred stock; that $4,000,000 of common stock had been issued to Brictson for the trade-name and good-will of his business; that $100,000 of preferred stock had been issued to Brictson for his plant, equipment, and use of patents, and that 39 shares of preferred stock had been issued for cash. In the detailed statement of the assets and liabilities of the corporation a number of discrepancies appear.

The application recited that the corporation was manufacturing the Brictson detachable tire tread and the Brictson

State, ex rel. Spillman, v. Brictson Mfg. Co.

10,000-mile pneumatic tire, but proposed to extend these operations more extensively and add the manufacturing of all kinds of high grade rubber tires, inner tubes, and all other rubber products. It further recited that "the funds from the sale of the company's preferred stock is to be used in the construction of a large modern factory, purchase of machinery, equipment, working capital, the manufacturing and marketing of the company's products," and that the company proposed to offer its preferred stock for sale through stock salesmen operating on a commission basis.

The application further recited that "the company wishes to call special attention to the fact that only a commission of 20 per cent. in cash and 5 per cent. in common stock donated by O. A. Brictson is being paid for the sale of the company's preferred stock," and recited further that the preferred stock was to be sold at par for cash or bankable notes; that a bonus of three shares of common stock would be given to each purchaser of one share of preferred stock up to the first $100,000 of preferred stock sold, two shares up to the second $100,000 sold, and one share for the remainder up to 5,000 shares sold. Upon this presentation the company asked for authority to sell $500,000 of its preferred stock.

The railway commission through one of its examiners made an examination of the books and plant of the corporation, and upon his favorable report issued a license to the corporation to sell its shares of stock for the year 1917, which license was renewed for the years 1918 and 1919. About the same time the company also secured a permit to sell its stock in South Dakota and Iowa.

Thereupon the company through its fiscal agent opened an office at Omaha, Nebraska, and entered upon an intensive campaign of stock selling. Literature of the most fascinating and alluring character was sent out. Among other things a picture of a large factory, four stories high, with smoke rolling from the chimney, and other evidences of operation were distributed with the statement: "The above

gives the elevation plans of the Brictson Manufacturing Company's new automobile tire factory and reclaiming plant to be located on the company's property consisting of six and one-half acres located at Twenty-fourth and Poppleton avenue. Contract for the unit of the factory will be awarded at once and at an early date additional buildings will be added to enable the company to increase its output to meet the growing demands for the Brictson tires." The circular also stated that 7 per cent. cumulative dividends would be paid on the preferred stock. The advertising matter was accompanied by letters of approval signed by prominent men in the state. Another circular stated that the company was making $37\frac{1}{2}$ per cent., and that it had business ahead for 14 years. It will serve no useful purpose to follow further the character of the advertising set out. Suffice it to say that it was well calculated to excite the cupidity of even conservative men.

A considerable portion of the record is devoted to a controversy between the company and the fiscal agent as to which one should be charged with the responsibility of sending out the literature, each charging the other with the responsibility. That question has no place here. In any event, the company by accepting the results of the advertising campaign would be bound by the methods employed in securing such results.

Exclusive of the $100,000 of stock issued to Brictson, the corporation through its fiscal agency sold to the public during the years 1917, 1918, and 1919, about $326,000 worth of preferred stock, of which $36,000 was sold in Iowa. An audit of the business affairs of the corporation made from the date of its organization to September 6, 1921, a few days after the appointment of the receiver, disclosed that the business of the corporation had been conducted at a loss of $32,809.73, the greater part of which was lost in 1921, but notwithstanding this fact the corporation declared and paid two annual dividends on its preferred stock, aggregating about $63,700. During this period Brictson drew a salary of approximately $43,000. It is quite ap-

VOL. 113]     SEPTEMBER TERM, 1925.     787

State, ex rel. Spillman, v. Brictson Mfg. Co.

parent that the dividends were paid from the proceeds of the sales of the preferred stock. At no time were the earnings sufficient to pay the dividends. Up to the date of the appointment of the receiver the corporation was a going concern operating at Brookings, South Dakota, and employing from four to six men besides the office force. At that time it owed no general creditor except for current expenses which amounted to about $1,000, and this amount was subsequently paid. It had cash on hand amply sufficient to pay its obligations. In addition to its cash and commercial paper it had liberty bonds of the face value of $60,650. Outside of its obligation to its stockholders the corporation was perfectly solvent.

The record further shows that in August, 1921, eight stockholders of the corporation, holding fifty shares of the stock, joined in an action against the corporation in the district court of the United States for the district of Nebraska, praying that a receiver be appointed to take charge of the affairs of the corporation, and that its affairs be wound up. The United States district court appointed a receiver who took possession of the property of the corporation, including money in banks at Brookings, South Dakota, and stock and materials on hand, and, after disposing of the property, brought the proceeds into this state. Outside of the state of Nebraska there was property of about $36,000 which came into possession of the receiver. He also took possession of liberty bonds, thrift savings stamps, commercial paper, cash in banks, and real estate in Nebraska aggregating a large sum. An appeal was taken from the order appointing the receiver to the circuit court of appeals of the ninth circuit, the opinion being reported in *Brictson Mfg. Co. v. Close,* 280 Fed. 297. In that case it was held that there was no basis in the pleadings or facts upon which a receiver could rest, and an order was made directing the receiver to return the property in his hands to those from whom he had received it. Before the receiver had made his report and obtained his discharge, the present action was commenced.

The main question presented by the record is whether the judgment is supported by the law and the evidence.

We first consider the judgment in its aspect ousting the respondent from doing business in the state. The rule is settled in this state that foreign corporations do business here as a matter of comity and not as a matter of right. The privilege extended to a foreign corporation may be revoked at the pleasure of the state, and *quo warranto* proceedings brought by the attorney general in the name of the state is one of the proper proceedings to cancel or annul the privilege. *State v. Standard Oil Co.*, 61 Neb. 28; *State v. Nebraska Distilling Co.*, 29 Neb. 700. Our statute authorizes foreign corporations to do business in the state upon compliance with its terms, which provide, among other things, for the payment of a filing fee of $50. While the right of a foreign corporation to do business in the state is a mere privilege, such privilege should not arbitrarily be canceled. The right of ouster is somewhat in the nature of a legal discretion, and should not be exercised without cause. However, when a foreign corporation is usurping its corporate powers, or violating the law, or doing acts in contravention of the established policy of the state, it may in proceedings brought for that purpose be ousted from the state.

The payment of dividends by the corporation from the proceeds of the sales of its stock and not from earnings was a violation of the statute and the policy of this state. In the absence of proof to the contrary, we may presume that the payment of dividends out of the corporate stock was also a violation of the laws of South Dakota. In the interest of present and prospective shareholders we think it was well within the province of the state to oust the respondent. In this connection the argument is made that the contract between the corporation and Brictson, hereinbefore alluded to, was a fraud upon the stockholders. This contract, however, was entered into before the application was made to sell stock in this state. The contract was a matter of public record, and stockholders who became such

after the execution of the contract had ample means of knowing of its existence. The stockholders who subscribed the first $3,900 of stock were parties to the making of the contract, and do not complain of it. Besides this, Brictson is not a party to this suit, and his rights under the contract cannot be determined here. From a consideration of the entire evidence bearing upon this phase of the case, we think the evidence justifies the judgment of ouster.

We come now to consider the phase of the judgment ordering the affairs of the corporation to be wound up and its assets distributed among its creditors and stockholders. A number of interesting propositions are discussed in the briefs bearing upon the question of the jurisdiction of the court to wind up the affairs of a foreign corporation. The general rule is that the courts of one state cannot dissolve a corporation created by another state, but may appoint a receiver of the corporation in a proper action, and administer the assets within its jurisdiction. Such cases usually arise when creditors of the corporation seek to enforce their demands. In the case before us, however, there is a complete failure to show that any creditor has reduced his claim to judgment. In fact, outside of some insignificant amounts, the general creditors of the corporation have been paid. There is evidence that 43 out of more than 1,000 stockholders have brought suit against the corporation to annul their subscriptions and recover the amount paid by them, upon the ground that they were induced to subscribe for stock through fraudulent representations. So far as the record shows, none of the stockholders have recovered judgment against the corporation. Five stockholders, holding 22 shares of stock, were witnesses in the present case and testified to facts tending to show that they were induced to become stockholders through fraudulent statements made by the agents of the corporation as to its affairs and business.

The rule is well settled that a court of equity has no jurisdiction to wind up the affairs of a foreign corporation and to decree a distribution of its assets among the individ-

ual stockholders at the suit of one or more of the stockholders as such. 3 Cook, Corporations (8th ed.), sec. 629; *Brictson Mfg. Co. v. Close,* 280 Fed. 297.

The relator cites sections 9295, 9298, Comp. St. 1922, which provide in substance that, if a corporation is ousted and dissolved by proceedings in *quo warranto,* the court shall appoint three disinterested persons as trustees to collect the assets and pay the debts of the corporation and divide the surplus among those thereto entitled. It is clear that these provisions apply only to those cases wherein the court has properly decreed a dissolution of the corporation.

The most that can be claimed is that a number of stockholders are dissatisfied with the management of the affairs of the corporation, and are claiming that they were defrauded in having been induced to purchase stock. It must be borne in mind, however, that a stockholder as such is not a general creditor.

The record is very voluminous. Many questions are discussed at length in the briefs, which in our view of the evidence need not be considered.

The judgment is affirmed in so far as it ousts the respondent from doing business in this state; and is reversed in so far as it undertakes to wind up the affairs of the corporation and distribute its assets among creditors and stockholders, and in appointing trustees to carry out that part of the judgment; each party to pay his own costs.

         AFFIRMED IN PART, AND REVERSED IN PART.

Note—See Corporations, 14 A, C. J., secs. 1391, 4000, 4107.