ALFRED P. SKEELS

*v.*

ISAAC N. PHILLIPS.

54  309
44a 336

EX TURPI CAUSA NON ORITUR ACTIO. During the year 1864, and before the close of the late war of the rebellion, a provost marshal in this State, to whom persons who might be drafted into the military service of the United States under the then pending draft, were required to report, entered into a secret arrangement with one of his deputies, by which the latter was to engage in the business of procuring substitutes and selling them to such of the drafted men as did not wish to serve in the army, the provost marshal agreeing so to exercise his power, as an officer, as to render this substitute business a monopoly in the hands of himself and his deputy, the profits to be divided between them. The business resulted in large profits, of which the principal in the scheme seems to have received more than his share, and in a suit by the deputy to compel a more equitable distribution of the spoils, it was *held*, the court could not permit the agencies of the law to be employed in aid of either party to such an illegal and corrupt bargain.

WRIT OF ERROR to the Circuit Court of Union county ; the Hon. MONROE C. CRAWFORD, Judge, presiding.

This was an action of assumpsit, commenced in the circuit court of Alexander county, by Alfred P. Skeels, against Isaac N. Phillips, and afterwards removed into the circuit court of Union county on change of venue.

The declaration contained the common counts, for work and labor, money lent, money paid, and money had and received.

The plaintiff sought to charge Phillips for work and labor performed in the years 1861 and 1862, and for a mare and colt sold to Phillips in 1862.

He also sought to charge Phillips for moneys received by him in 1864, while provost marshal of the thirteenth congressional district of Illinois, as proceeds of the substitute business in which Skeels and Phillips were, at the time, engaged, Skeels contending that Phillips received more than his share of the profits of that enterprise.

The circumstances under which this last charge arises, will be found developed by the testimony of the parties themselves.

*Alfred P. Skeels,* the plaintiff, testified, in his own behalf, that, in August, 1864, he came from New York to Illinois, and met the defendant, Phillips, at the residence of the latter, when he told him he wished to get the money he owed him. Phillips told him he could not pay him then, but would at the next pay day, Phillips being at the time provost marshal. The witness proceeded as follows : Phillips said that, while I was waiting, I could fill the position of David Gow, in his office at Cairo, who had been confined two months with inflammatory rheumatism, with no prospect of being out in two months; that he often wished me there in that position ; that he had been doing double duty ; that if I would take the position I could earn $100 per month ; that he could arrange matters about board, etc. so that I could make as much more ; that while I was performing duties of deputy under him, I could arrest deserters, for which I would be paid thirty dollars each. I told him that, as I needed all the money during the coming winter, I would accept, and stay till the first of October, at least. I went down to Cairo on morning train, September 1, 1864, and entered upon what I supposed to be the duties of deputy provost marshal, and performed same until October 2, 1864.

When they were making out pay roll of officers for September, he came to me and said : "Fred, it won't answer for your name to go forward on this pay roll, because your name appears on our record of deserter returns as having arrested some deserters, and officers of government not being allowed to receive reward, we shall have to send Gow's name forward instead of yours;" that he would retain the money from Gow, and hand it to me. Left employ as deputy provost marshal October 2. October 2, Phillips called me into his private office and said he was about to broach a thing to me he would to no other man living; that I knew there was not a provost marshal in the State who had not made more or less out of his position—

that he had never made a dollar outside of his salary; that he stood before the world in his capacity of provost marshal unspotted; that I knew his condition of indebtedness to certain parties, mentioning the Hartlines and Randleman, who held a mortgage on certain property of his; that if he could only make out of this, in some way, a sufficient sum to pay off those obligations, it would leave him in possession of about $20,000 worth of unincumbered property, and himself and family in comfortable shape; that if I would make $2000 for him, and see that he obtained it a way that no one would know it, he would give me all the advantages that lay in his power as provost marshal, when the drafted men came to report on the draft, then pending, the advantages of putting in substitutes, and that I would be able to make for myself more than he asked. I said that if I entered upon a matter like that, my connection with the provost marshal's office must cease. He said I should have the privileges of taking charge of the trains, which I had had over two weeks; that I might take out or pass out such substitutes or recruiting material as I had opportunity. I told him that I thought I could make some money by letting out parties that I had stopped (sometimes he gave me permission to do so); that I would see what I could do the next day; that Devasse, of A. J. Harrison & Co. had frequently made overtures to me to let him out with substitutes; that Devasse had from nine to fourteen that he wanted to take to Peoria or Jacksonville; that I would see him and see what could be done.

On or about the fourteenth of October, 1864, after I had been in this new business, by appointment I went to South Pass with Phillips. I had succeeded in making several thousand dollars between October 2 and 14, most of which I had deposited with Mrs. Mary T. Goodwin. Up to that time had deposited with her something over $6000. Phillips said that, since I had done so well, I ought to give him more, $2500, at least. The afternoon of the fourteenth, we went to South Pass, and I directed Mrs. Goodwin to pay him out of my

funds $2500. She and Phillips and myself were present, and she paid him the $2500, which was in consideration of the agreement made with him when I went out of office in Cairo.

The witness then gave in detail the sums of money received by himself and Phillips, respectively, in the business of selling substitutes, claiming that he, Phillips, was indebted to him on that account over $6,000.

*Isaac N. Phillips,* the defendant, testified as to the manner in which he became acquainted with Skeels in the year 1861, and the transactions he then had with him, and stated as follows: The next time I saw him was when he came to my house, September 1, or latter part of August, 1864 ; said he had quit studying in New York, and wanted something to do ; and said, "now, Ike, give me something to do for God's sake ;" I went to Cairo ; don't know how long I was gone ; I told him I thought I had a money making scheme, just the place for him, and we had then and there a talk about the matter, and we agreed we should go to Cairo and go to work there ; the arrangement was, that he was to go to Cairo and look out for my office there, and we were to look out for such things as came up—nothing dishonorable ; he was to have $100 per month, board and expenses ; this was the latter part of August or first of September, 1864 ; kept no record of dates ; he remained in my service, at $100 a month, for about four months, I think ; when at Cairo, he boarded with me, and at my expense, at the International Hotel ; paid his travelling expenses ; he was in recruiting and substitute business ; I was a provost marshal during the time, and it was a business I could not enter into, and I required an outside man, and employed Skeels in that, and it was done in another man's name. I said to Skeels, there is money in this business ; I can't do it ; if I had a confidential man, I could ; I will give you $100 per month, and take the chances ; if I make money, or not, all right. He accepted the proposition and went with me to Cairo ; did but little until last of September, just before

the draft; then he began to do something—putting in substitutes; everything done in his name. Before operating in substitutes, I sent him on errands around the country, and relieved myself a little; he never was under pay from government in my service; I never received a cent from government for his services; he arrested a few deserters, I think ten or twelve would be the outside number; he told me he had received $190 for deserters; that is all I have any recollection of now; I never kept any written record of it; from time to time he returned money to me and left money where it was paid to me from time to time. I may have borrowed five, ten or twenty dollars, but don't remember; never borrowed any considerable amount; don't remember amount paid to me; this money paid from time to time I received as money belonging to me; he would say so much money for you so and so, and I would get it. It was understood between him and me that he should deposit it with Mrs. Goodwin, in that he might be able to swear, in case of prosecution, that he never paid any money to me; it was supposed to be a violation of military law for a provost marshal to engage in this business, and this was arranged with a view to avoid any such trouble; plaintiff, in case of prosecution, was to testify that he gave me no money.

This was, substantially, the testimony of the parties in reference to the character of the transaction out of which the principal claim of the plaintiff arose.

The trial resulted in a verdict and judgment for the plaintiff, but for a less amount than he claimed, and he thereupon sued out this writ of error.

Mr. Louis Houck and Mr. J. M. Lansden, for the plaintiff in error.

Mr. J. Dougherty, for the defendant in error.

Mr. CHIEF JUSTICE LAWRENCE delivered the opinion of the Court:

This was an action of assumpsit, brought by Skeels against Phillips. The declaration contained only the common counts. Skeels sought to charge Phillips for work and labor performed for him in 1861, and for the amount due on a mare and colt sold to him in 1862. He also sought to charge him for money received by him in 1864, when provost marshal of the Thirteenth Congressional district of this State, under circumstances to be hereafter stated. The jury found for the plaintiff a verdict of $264, and the court gave judgment for that amount. The plaintiff, claiming a much larger sum, has brought a writ of error. The jury evidently found their verdict upon the transactions of 1861 and 1862, ignoring the matters connected with the provost marshalship in 1864, and it is the claim growing out of this last transaction that we are now asked to enforce.

We must say, in the beginning, that this claim, as stated in the testimony of the plaintiff himself, belongs to a class which parties rarely have the audacity to seek to enforce in a court of justice.

The plaintiff states that he went to Cairo September 1, 1864, and entered upon what he supposed to be the duties of deputy provost marshal, and performed the same until October 2, 1864. On that day the defendant, then provost marshal, called the witness into his private office, and said he was about to broach a thing he would propose to no other man living; that there was not a provost marshal in the State who had not made more or less out of his position, while he had made nothing outside of his salary; that he was in debt and wished to make money to pay off his debts; that if witness would make $2000 for him, and see that he obtained it in such a way that no one would know it, he would give witness all the advantages in his power as provost marshal, for putting in substitutes when the drafted men came to report under the pending draft, and that witness should have exclusive control of trains for the purpose

of passing substitutes. In accordance with this arrangement, the plaintiff swears he had the exclusive privilege of furnishing substitutes for about two weeks. Of course with this monopoly thus basely and unlawfully furnished to him by the defendant, he could charge for the substitutes any sum which the means of his victims would enable them to pay, and we are, therefore, not surprised when the plaintiff coolly tells us, in his testimony, that in less than a fortnight he had made and deposited with a Mrs. Goodwin over $6,000, which he and Phillips divided. But, besides this, he says large sums were paid directly to Phillips in this substitute business, on the order of plaintiff, and that Phillips is now indebted to him over $6,000 for his share of these ill-gotten spoils, which Phillips refuses to disgorge.

The defendant was also sworn, and his account of the transaction does not differ materially from that of the plaintiff, except as to the mode in which they were to divide the spoils. The defendant swears that plaintiff was his agent, and was to have only $100 per month, much more than which sum he paid him, as the plaintiff would draw upon him and he did not dare to dishonor his drafts. He says the plaintiff was to pay what money he received to Mrs. Goodwin, so that he might be able to swear, in case of prosecution, he had never paid any to defendant.

Both these parties have voluntarily placed themselves upon the stand for the purpose of testifying to their own dishonor. By the testimony of both, they entered into a combination by which the great official power that had been entrusted to one of them, under the emergencies of war, was to be perverted to purposes of oppression and plunder, and the pair having quarreled, this court is now asked to sit as umpire and divide the spoils. If we could compel both parties to disgorge, for the benefit of the public treasury, we should be glad to do so, but, as between the parties themselves there are no rights growing out of such a transaction which the law can stoop to enforce. "*Ex turpi causa non oritur actio*" is a very familiar maxim.

*Judgment affirmed.*