# RICHARD C. CRAFT *et al.*

### *v.*

# JAMES O. McCONOUGHY.

1. CONTRACT—*when in restraint of trade, is void on the ground of public policy.* A contract entered into by the grain dealers of a town, which, on its face, indicates that they have formed a partnership for the purpose of dealing in grain, but the true object of which is to form a secret combination, which would stifle all competition, and enable the parties, by secret and fraudulent means, to control the price of grain, costs of storage and expense of shipment at such town, is in restraint of trade, and consequently void on the ground of public policy.

2. EQUITY—*will not aid a division of the profits of an illegal transaction between associates.* Where parties have entered into a contract in restraint of trade, and therefore contrary to public policy, a court of equity will not lend its aid to require an account of profits and a division thereof, although the contract has been executed.

WRIT OF ERROR to the Circuit Court of Ogle county; the Hon. W. W. HEATON, Judge, presiding.

Mr. M. D. HATHAWAY, Mr. WILLIAM BARGE, and Mr. SHERWOOD DIXON, for the plaintiffs in error.

Mr. JAMES K. EDSALL, for the defendant in error.

Mr. JUSTICE CRAIG delivered the opinion of the Court:

This was a bill in equity, brought by James O. McConoughy against Richard C. Craft and others, for an account and distribution of the profits of an alleged partnership claimed to have existed under a written contract, to· the following effect:

"Articles of agreement made and entered into. this 20th day of April, A. D. 1869, between the following persons, viz: E. P. Sexton, Dr. John McConoughy, C. B. Boyce, R. C. Craft and William Wiswell, for the purpose of systematically pursuing the grain trade in Rochelle, and for mutual

protection against losses. The said parties covenant and agree to enter into the grain trade for one year from this date, upon the following terms: Our several grain houses shall be put into the business upon the basis of twenty-seven shares as the aggregate, divided as follows: C. B. Boyce and R. C. Craft shall be entitled to nine shares, E. P. Sexton to six shares, J. McConoughy to six shares, and William Wiswell to six shares. Each separate firm shall conduct their own houses as heretofore, as though there was no partnership in appearance, keep their own accounts, pay their own expenses. ship their own grain, and furnish their own funds to do business with; a list of all the grain purchased by each firm to be made every day and handed to the general bookkeeper, with amounts paid for the same; also every car shipped to be reported at the time, and every account of sale to be handed in to said bookkeeper, as well as all sales made at the warehouse from time to time. It shall be the duty of the bookkeeper to make a faithful record of all the grain bought by each party, the amount of money paid for the same, and place to his debit, and also to credit him with all account of sales, as well as any transactions made at the warehouse, and, at the end of every month, each individual's account to be balanced, showing the profits or loss, which amount is to be divided *pro rata,* according to the number of shares held by each party. It is further agreed, that there shall be no grain held for advance in price, or for any other cause, by any of the above named parties.

"Prices and grades to be fixed from time to time, as convenient, and each one to abide by them. All grain taken in store shall be charged one and a half cents per bushel, monthly; but if sold inside of thirty days, no storage to be asked. No grain to be shipped by any party at less than two cents per bushel."

In November following the execution of the agreement, John McConoughy died, and it is the theory of the bill that

the complainant, who was his son, by mutual consent came in and took his place under the contract.

It is set up in the answer, that the contract was made in restraint of trade, and is against public policy, and void; that all transactions with complainant or with his father and defendants, under or in pursuance of it, and under the alleged arrangement with complainant after the death of his father, were in restraint of trade, against public policy, and void.

Two questions arise upon the record : First, whether, the contract set out in the bill is void. Second, if illegal and void, will a court of equity, after it has been executed. require one of the parties to account to another for a portion of the gains arising under the contract ?

Prior to and up to the time of the execution of the agreement set out in the bill, the four parties were engaged in the grain business in the town of Rochelle, each one on his own account, and in competition with each other, but, after the agreement was executed, all competition ceased. All the warehouses in the city, and every lot suitable to erect a warehouse upon, were controlled by the combination. Some were purchased and others leased, so that the combination formed effectually excluded all opposition in the purchase, sale, storage and shipment of grain in that market.

Secret meetings were held in the night-time by the parties to the contract, at which the price to be paid for grain was agreed upon, rates for storage and shipment fixed, in order that the public should be kept in ignorance of the plans and operations of this illegal combination.

To the public the four houses were held out as competing firms for business. Secretly they had conspired together, and were working in a common cause, in the sole interest of each other.

The language used in the contract itself leaves no room for doubt as to the purpose for which the agreement was entered into, as a few extracts will show: "Each separate firm shall conduct their own business as heretofore, as though there was

no partnership in appearance, keep their accounts, pay their own expenses, ship their own grain, and furnish their own funds to do business with."     *     *     *     "Prices and grades to be fixed from time to time, as convenient, and each one to abide by them. All grain taken in store shall be charged one and one-half cents per bushel, monthly."     *     * " No grain to be shipped by any party at less rates than two cents per bushel."

While the agreement, upon its face, would seem to indicate that the parties had formed a co-partnership for the purpose of trading in grain. yet, from the terms of the contract, and the other proof in the record, it is apparent that the true object was, to form a secret combination which would stifle all competition, and enable the parties, by secret and fraudulent means, to control the price of grain, cost of storage. and expense of shipment. In other words, the four firms, by a shrewd, deep-laid, secret combination, attempted to control and monopolize the entire grain trade of the town and surrounding country.

That the effect of this contract was to restrain the trade and commerce of the country, is a proposition that can not be successfully denied.

We understand it to be a well settled rule of law, that an agreement in general restraint of trade, is contrary to public policy, illegal and void, but an agreement in partial or particular restraint upon trade has been held good, where the restraint was only partial, consideration adequate, and the restriction reasonable.

This subject was ably discussed in the leading case of *Mitchell* v. *Reynolds,* 1 P. Williams, 181; see, also, 1 Smith's Lead. Cases, 172, and notes, and the rule of law established, which has been followed and adhered to in numerous cases since.

In reference to the point, what might be regarded a reasonable restriction, numerous cases might be cited, but what was said in *Horner* v. *Neves,* 7 Bing. 743, will illustrate the

principle. TINDAL, C. J., said: "We do not see how a better test can be applied to the question, whether reasonable or not, than by considering whether the restraint is such only as to afford a fair protection to the interest of the party in favor of whom it is given, and not so large as to interfere with the interest of the public. Whatever restraint is larger than the necessary protection of the party, can be of no benefit to either. It can only be oppressive, and if oppressive, it is, in the eye of the law, unreasonable. Whatever is injurious to the interest of the public, is void, on the ground of public policy."

If, therefore, the restraint imposed by the contract in question was but partial, as insisted upon by the complainant, as it was unreasonable, oppressive and injurious to the public, it can not be sanctioned in a court of equity.

While these parties were in business, in competition with each other, they had the undoubted right to establish their own rates for grain stored and commissions for shipment and sale. They could pay as high or low a price for grain as they saw proper, and as they could make contracts with the producer. So long as competition was free, the interest of the public was safe. The laws of trade, in connection with the rigor of competition, was all the guaranty the public required, but the secret combination created by the contract destroyed all competition and created a monopoly against which the public interest had no protection. *Morris Run Coal Co.* v. *Barclay Coal Co.* 68 Penn. St. 173.

It is, however, insisted that, even if the contract was contrary to public policy, as it has been executed, a court of equity will require an account.

The rule is, however, well settled in this State, that a court of equity will not lend its aid in the division of the profits of an illegal transaction between associates. *Neustadt* v. *Hall*, 58 Ill. 172 ; *Skeels* v. *Phillips*, 54 Ill. 309 ; *Jerome* v. *Bigelow*, 66 Ill. 452.

The complainant and the defendants were equally involved in the unlawful combination. A court of equity will assist neither.

The decree will be reversed and the cause remanded.

*Decree reversed.*