Cummings v. Foss.

---

R. F. CUMMINGS ET AL.

v.

S. D. FOSS ET AL.

*Contracts—Void as against Public Policy—Corners.*

1. The law will not attempt to adjust differences which arise out of transactions which it condemns.

2. Combinations having for their object the enhancement of the price of articles of prime necessity, as food, for purposes of extortion, are against public policy and void.

3. Under the common law as it formerly existed such a combination would have been a criminal offense.

4. In an action brought to recover for moneys alleged to have been advanced, and services rendered in aid of such a combination, this court holds that the judgment for the plaintiffs can not stand.

[Opinion filed May 5, 1891.]

APPEAL from the Circuit Court of Cook County; the Hon. RICHARD S. TUTHILL, Judge, presiding.

Messrs. SIDNEY SMITH, H. K. WHEELER, and SMITH, HELMER & MOULTON, for the appellants.

Messrs. G. W. & J. T. KRETZINGER, for the appellees.

WATERMAN, J. Early in 1888 a number of gentlemen engaged in purchasing corn in this and adjoining States, and then holders of large amounts of corn, met in Chicago, called in William Foss, one of the plaintiffs, and explained to him that there was a combination forming to buy up cash corn; they told him that there was only a small amount of corn in the country, and by buying up the cash corn it would advance.

It was understood by all, that with the aid of the plaintiffs bringing in certain other persons, not parties to this suit, and the purchase of May options, and withholding of the corn owned by defendants, and the corn of all interested in the transaction, from sale, except as it might in the interest of all be sold by the plaintiffs, corn could be forced up.

There is a good deal of testimony that there was much talk about running a corner. Mr. Moore testified that Mr. Foss said that the arrivals of cash corn in Chicago, grading No. 2, were only a few cars a day; and that by buying it up as fast as it came in, either cash or May options, they could corner the market; that Foss further said that his firm would advance all the money necessary to buy all the cash corn that might be delivered, and May options, and corner the markets.

Mr. Brown testified that Mr. Foss said there would be no trouble in running a corner, and that in connection with this he said that his firm had 150 customers in Iowa on their books that had corn in the cribs, and he could control them; that he could have them hold it back and not ship it; that there would be no trouble in running the price of corn very high.

Foss does not deny making these statements, but he does deny that he agreed or endeavored to run a corner.

With the knowledge of plaintiffs, the following agreement was made:

"GRAND PACIFIC HOTEL, CHICAGO, April 4, 1888.

This agreement, made and entered into this 4th day of April, 1888, between C. W. Hartley, Hall & Ross, S. B. Walton, R. F. Cummings, Moore & Bushnell, Union Grain Company, O. Barnard, Curtis & Bowman, D. A. Fredericks, W. S. Rankin, J. Shonkwiler and the Rice Elevator Company, in which the parties herein named agree to and with each other to form a syndicate, for the purpose of buying cash corn and May options in corn in Chicago, from time to time as the majority may decide ; each of the above named parties agree to advance the sum of $5,000, for each full share, or a fractional part of same for a fraction of a share, by cash or certified check, for the purpose of protecting, carrying or otherwise handling said purchases of cash corn and May options in corn from time to time, it being further agreed that C. W. Hartley, Tim Ross, H. L. Bushnell and S. A. Brown act as an executive committee for said syndicate, and that we shall be responsible only for the amounts subscribed by each of us from time to time ; that all gains or losses shall be divided *pro rata* to each share or a fractional part of a share ; that said executive committee shall have full authority to act for us and purchase cash corn and May options, and sell same to the extent of the authority given to them by us from time to time, for which we are to be held responsible only for a share, or a fractional part of a share *pro rata.* A majority vote, *vive voce,* or telegraph, shall constitute valid instructions.

| | |
|---|---:|
| R. F. Cummings | $2,500 |
| S. B. Walton | 2,500 |
| O. Barnard | 2,500 |
| Hall & Ross | 2,500 |
| D. A. Fredericks | 1,250 |
| C. W. Hartley | 5,000 |
| Moore & Bushnell | 5,000 |
| Union Grain Company | 5,000 |
| Bowman | 2,500 |
| J. Shonkwiler | 1,250 " |

About April 26th, powers of attorney like the following

were obtained from some of the parties to the foregoing agreement, and from others.

"Know all men by these presents, that for and in consideration of the sum of one dollar, in hand paid by Foss, Strong & Company, of Chicago, Illinois, the receipt whereof is hereby acknowledged, I have made and hereby do make, constitute and appoint Foss, Strong & Company, of Chicago, Illinois, true and lawful agents and attorneys in fact for the purposes following, viz. : Whereas, I have heretofore bought four hundred and fifty thousand bushels of No. 2 corn, for May, 1888, delivery at Chicago, Illinois, through E. H. Bailey & Co., commission dealers in said Chicago, which contract of purchase remains in full force and effect ; therefore, I do hereby make said Foss, Strong & Company, my attorney in fact, to manage and control said contract for me in my name, place and stead, and to that end I hereby authorize and empower my said attorney, in case he should deem best, at any time during the continuance of said purchase contract, to make contracts for the sale of not exceeding four hundred and fifty thousand bushels of corn for like May delivery at Chicago, at the current market price at the time of such sale, such sale to be in my name, on my account, and for the purpose of being a set-off to the aforesaid contract of purchase.

"In case the said corn bought by me as aforesaid should be delivered or tendered to me when the time for such deliveries matures, then my said agent is hereby specially authorized to receive such corn on my account, and is further authorized to turn the same over, or make delivery thereof upon, or in fulfillment of, any sales to be made by him in my name as aforesaid. And I hereby agree to ratify and confirm all sales made by my said agent in my name as aforesaid; and agree to furnish him, when called upon, with all moneys necessary to protect said purchase or sales during the continuance of the contract therefor, and to protect him from all loss or liability incurred in or about the same. And I further agree to give no orders to said A. E. Bailey & Company, commission men, contrary to the orders given by my said agent, but give to my said agent and attorney the full control and authority over

said contract, leaving him to exercise his best judgment in controlling said contracts in all particulars.

"Said agent and attorney is further authorized and empowered, wherever he sees fit to do so, to settle and close out the said contract of purchase made with A. E. Bailey & Company of Chicago, Illinois, and also any sales of corn he may hereafter make on my account, and to receive and receipt for in my name all moneys coming to me on account of such purchase or sales; to adjust and determine all balances due to me or from me on account thereof, and no more.

"To fully carry out the purpose of this appointment, I hereby direct said A. E. Bailey & Co., of Chicago, to receive, accept and act in accordance with all orders or directions given by said agent and attorney, in and about the receiving and delivery of said corn so bought as aforesaid, or in making contract for sales as aforesaid, as fully to all intents and purposes as though given by me.

"It is also agreed, that any sales or settlements made by my said attorney, by virtue of the power hereby given, may be pro-rated with such other persons as may be interested or combined with me in the contracts now or hereafter placed with said Foss, Strong & Co., in the proportion that my interest in the same bears to the whole deal placed with said Foss, Strong & Co. It being understood that my aforesaid contract of purchase is in connection with purchases made by divers other parties, a list of whose names, and the number of bushels held by each, are hereto attached, marked 'Exhibit A.' And all of said deals are to be controlled together, for the benefit of all, according to their several interests.

"Hereby giving my said attorney full power in the premises, and ratifying and confirming all acts done by him thereunder, and making these presents irrevocable for the purposes aforesaid.

"I agree to pay said agent and attorney as compensation for his services in the premises, the usual commission for buying and selling corn in accordance with the rules of the Chicago Board of Trade.

"Witness my hand and seal, this 26th day of April, A. D. 1888.

"C. H. HARTLEY."

Sylvester D. Foss testifies as follows:

"D. B. Strong, Joseph Reynolds and myself are the plaintiffs. Firm name was Foss, Strong & Company, commission business, in the city of Chicago. Am acquainted with some of the defendants. Our firm had transactions with the defendants in 1888. We bought a number of million bushels of corn for the syndicate. I can not give the date of the transaction. The first man that spoke to me was S. A. Brown. He told me there was a combination. They were forming to buy up the cash corn, as there was no cash corn—no corn in the country hardly. He said his parties were in the grain business, that there was only a small amount of corn in the country, and by buying up the cash corn the market would advance. He said they were coming up from the country and were going to have a meeting. They had their meeting. He asked me to go over to the Grand Pacific and meet these gentlemen. I met them. They were in one of the rooms at the Grand Pacific. I did not know the men whom I first met there; was introduced to them. They are the defendants in this case. There was Bushnell, Hartley, Brown, Cummings and Moore, Thompson, of the Rice Elevator Company, and a number more whose names I can not think of. They proposed to buy up May corn and pay for cash corn, and the market would rise by so doing.

"They had a committee appointed of four or five that gave all the orders—Hartley and Ross and Brown and Bushnell and Moore, I think. After my interview with them at the Grand Pacific, the committee called on me the next day, two or three of them; I think Hartley was treasurer of the syndicate. They had each one of them a house of their own; that is, houses which they did their business with here in Chicago, on the Board of Trade. They had a good deal of corn bought in the country and they had corn bought here, and to keep the thing from being sold out, one taking advantage of the other, we were to do the selling for everybody in the syndicate. We called the account 'XX.' I think it is so entered in our books. When I say syndicate I mean the parties representing the XX account and the parties that had deals outside.

We put their corn in with the XX to have it sold, and pro-rate the profit or loss. Some of these parties had their accounts with us."

· From the testimony of William Moore, one of defendants, it appeared that "Exhibit A," mentioned in the powers of attorney, was as follows:

"EXHIBIT A."

| | |
|---|---:|
| Curtiss & Bowman...................... | 80,000 |
| Rice Elevator Company................. | 55,000 |
| William Moore & Company............... | 75,000 |
| C. W. Hartley......................... | 250,000 |
| W. A. Rankin ......................... | 10,000 |
| Union Grain Company................... | 2,000,000 |
| Dennis Kenyon ........................ | 175,000 |
| Hall & Roos........................... | 50,000 |
| C. W. Hartley......................... | 450,000 |
| Moore & Bushnell ..................... | 100,000 |
| D. A. Fredericks...................... | 60,000 |
| Moore & Dawson ....................... | 75,000 |

It was testified by one of the defendants, and not denied by plaintiffs, that Foss said he could control his correspondents and keep their corn out of the May market, and he thought it would be necessary to buy a million bushels.

It is strenuously denied by counsel for appellants that there was any attempt to run a corner. Whatever may have been attempted, it is manifest that no corner was created, and it is perhaps fair to conclude that there was at no time an attempt or an expectation of being able to corner the market.

What, then, was this transaction, and if not an attempt to corner the market, was it in any way an unlawful undertaking?

It was clearly a combination to enhance the price of corn. The parties who entered into it had on hand, or had purchased, large amounts of corn. It is not pretended that they had any use or need for more; nevertheless, they entered into an agreement to purchase cash corn and May options, as the plaintiff Foss testifies, because by buying up the cash corn the

market would advance. Other parties were also large holders of corn and they were brought into the arrangement; a combination was made not only to purchase corn, but to prevent the free selling thereof; - all the immense amount of corn owned by these parties was put into the hands of the plaintiffs; they were to control all, and thus by united holding, united purchases, and no sales, save such as should be for the benefit and the interest of all, the market was to be controlled, the price of a staple commodity, one of the prime necessities of life, enhanced, and it was expected great gains would be made by the parties to the combination, while he who had corn to buy for food would be compelled to pay, not the price of a free market, but the sum to which, by such combination, such united holding and withholding, the market might be forced.

The plaintiff Foss declares that he thinks that at the meeting where the formation of the combination was under consideration, he stated that the combination of the people who proposed to form the XX company with the people whom his firm represented, would be able to buy up all the cash corn and force the market up to higher prices. That Hartley said it was agreed nobody should sell unless the committee gave the orders.

In Greenhood on Public Policy, 642, it is said: "Combinations whose object is to create what are known as 'corners' in the market, or to control the traffic in any staple which is a popular necessity, or to enhance the price thereof, or to withhold the same from the market, or to prevent competition in the sale thereof, are void."

The Supreme Court of this State in Samuels et al. v. Oliver et al., 130 Ill. 73, quote approvingly this rule, and say: "The enhancement of the price of an article of prime necessity, such as wheat or other articles necessary for food, for purposes of extortion, is against public policy."

It is manifest in the present case, that the clear tendency of the acts of the parties was to unnaturally enhance the price of an article of prime necessity; to create as to it an artificial scarcity, and to compel those whose necessities com-

pelled them to buy, to pay, not the price determined by entire freedom of buyers and sellers, but the price to which their combination to buy and to withhold might be able to force the market.

Such combination was clearly against public policy, and such conduct of a character that, if it be not now, under the common law as it existed a century and a half ago would have been a criminal offense.   Blackstone's Com. by Cooley, Vol. 4, p. 158–160; Bishop on Criminal Law, Sec. 518 to 529; Salt Co. v. Guthrie, 35 Ohio Stat. 666; The Morris Run Coal Co. v. The Barclay Coal Co., 68 Penn. St. 173; The People v. Fisher, 14 Wend. 9–16–18; Craft et al. v. McConoughy, 79 Ill. 346; Arnot & Pittson v. Elmira Coal Co., 68 N. Y. 558–565; Clancy v. Onondaga Salt Mfg. Co., 62 Barb. 395.

It is manifest that the means adopted were well calculated to affect the object aimed at, viz., to force corn up.

Holding the great amount of corn the parties to this transaction did, with the scarcity of corn in the country, the purchase of all cash corn offered and of May options would tend not only to cause an unnatural rise, "to force the price up," but was quite likely to bring about a corner in May corn.

With a scarcity of corn in the country, the direct tendency of this combination, not only to purchase such corn and May options, but to withhold from market the large amount of this grain controlled by these confederates, was injurious to the public, and therefore void.   Craft v. McConoughy, *supra;* Homer v. Neves, 7 Bing. 743; Commonwealth · v. Carlisle Brightly's R. 36–40.

One of the plaintiffs, Mr. Foss, not only was cognizant of all this unlawful combination did, and for his firm undertook to carry out its ends, but himself had as an owner of an account known as " No. 7," an interest in the transaction to the extent of one-half of 900,000 bushels.

To the claim of the plaintiffs for moneys advanced and services rendered in aid of this confederacy, so opposed to public interests, so inimical to public welfare, so calculated to make unnaturally dear, food for man and beast, the law answers *"ex turpi causa non oritur actio."*

It is immaterial that the defendants' defense is based upon a confession of their own unlawful conduct. The law will not attempt to adjust differences which arise out of transactions it condemns. It will leave the parties where their own conduct leaves them. It will not compel them to divide the plunder or share the loss of an unlawful enterprise; neither will it require them to renumerate those who, with full cognizance of the character of such undertaking, assist them with money or service.

The judgment of the court below is reversed and the cause remanded.

*Reversed and remanded.*