Statement.
MONROE, J.
Plaintiff sues on a promissory note for $2,500, received under an agreement of date June 8, 1898, which is made part of its petition and which reads, so far as it needs be quoted, as follows, to wit:
First: “The party of the first part [Bierce et al.] * * * agrees to pay to the party of the second part [Webb Company] * * * $5,000, one-half of which shall be payable immediately * * * and one-half payable one year from date; * * * said $2,500 to be evidenced by a promissory note.”
Second: “The party of the second part is the owner” of a certain lot in Oklahoma City, “and upon the consideration expressed * * * agrees that said land * * * and no other real property now owned or controlled or hereafter acquired by it within 100 miles of Oklahoma City shall be used or sold by said party of the second part to be used in any matter for ■cotton compress purposes, or for railroad tracks ■or switches leading to any compress, for a period of two years.”
Third: “Upon consideration of the mutual promises herein contained and as to the party of the second part upon the further consideration of the payment of the sum above mentioned, the parties * * * agree * * * not to erect * * * or operate, or to be interested
* * • in the construction * * * or operation, of a cotton compress at any point within a radius of 100 miles of the post office of Oklahoma City, and not to sell or barter * * * or to be interested in selling or bartering a cotton compress to be erected or operated within said radius, for a period of two years, * * * without a written consent of the other. * * ♦ ”
Fourth: “The party of the second part shall place J. Y. Webb, Jr., at its own expenses, for the next thirty days, or as much thereof as the party of the first part may deem expedient, at the disposal of the party of the first part, for the purpose of visiting cotton buyers * * * and securing their patronage for the Oklahoma Cotton Compress Company and securing subscriptions to their capital stock, it being expressly understood that the provisions of paragraph 3 hereof have no application to the construction and operation of a compress at or near Oklahoma City by- the Oklahoma Cotton Compress Company, and the party of the second part expressly agrees that its officers and agents will and shall not, nor will its employes, with the knowledge and consent of its officers, * * * do or declare any act or thing calculated to injure the business of Oklahoma Cotton Compress Company within two years of this date.”
Fifth: “If there shall be erected * * * at or immediately about Oklahoma City, or within 25 miles thereof, the cotton compress, within one year from this date, in whole or in part, with a view to the use of the same for the compressing of cotton, then the consideration of said notes shall be ■ deemed to- have failed, and the same shall not be paid, but shall be returned to the maker thereof,” etc.
Sixth: “The parties hereto being interested in the cotton compress business at Oklahoma City and vicinity, and the party of the second part desiring to sell his interest and good will therein to the party of the first part, it is expressly agreed * * * that the good will of the said Webb Press Company limited in the cotton compress business at said Oklahoma City and within said radius is part of the consideration for the payment of said $5,000 and the making of this contract, which good will is hereby sold and transferred to the said party of the first part.”
Seventh: “If there shall be any breach óf any of the terms of * * * paragraphs * * * 3 and 4 hereof, the party upon whose part said breach * * * shall occur * * * agrees to pay to other party hereto the sum of $10,000 as liquidated damages,” etc.
The defendants, for answer, admit the execution of the note and contract sued on, but allege that they evidence an agreement *908 in restraint of trade and in violation of the law of the place where they were made and were to be executed; that plaintiff had no authority to bind J. Y. Webb, who was not a party to the agreement and who rendered no service thereunder, and that plaintiff was not interested in any cotton compress business in Oklahoma City or its vicinity. .They further allege that, should the agreement be held valid, there has been a failure of consideration as to the note sued on, in that plaintiff violated articles 3 and 4 of the contract pursuant to which it was given, and they pray for judgment, in reeonvention, for $10,000 as liquidated damages.
Prom the evidence and admissions in the record, we find the facts to be as follows: The statutes of Oklahoma provide that:
“Every contract by which one is restrained from exercising a lawful profession, trade, or business, of any kind, otherwise than as provided by the next two sections, is, to that extent, void. * * * One who sells the good will of a business may agree with the buyer to refrain from carrying on a similar business within a specified county, city, or part thereof, so long as the buyer, or any person deriving title to the good will from him, carries on a like business therein.” Wilson’s Rev. & Ann. St. Okl. 1903, §§ 819, 820.
Section 821 relates to agreements between partners.
It is admitted that the common law prevails in Oklahoma, save as changed by statute. Oklahoma Oity is about six miles from the line dividing Oklahoma county from Cleveland county, and about nine miles from the line dividing it from Canadian county. Plaintiff and defendants are the respective owners of patented compresses known as the “Webb Press” and the “Bierce Hydraulic Press,” and prior to and at the time of the making of the contract sued on there had been, and was, hot competition between them in the business of selling and establishing their presses. Defendants (the firm of William W. Bierce, composed of William W. and Columbus Bierce) had gone to Oklahoma early in the spring of 1898 with a view of establishing one of their presses, and as an inducement to them to do so the city, in April of that year, had donated to the corporation known as the “Oklahoma Cotton Compress Company” (which the Bierces organized and to the stock of which they were the largest, though not the only, subscribers) a lot of ground worth $3,000; and not only had contracts been entered into for the establishment of the press, but some material was on the ground and the work of putting in the-foundations had actually begun. At that juncture, say about June 1st, plaintiff’s representatives appeared and became active (to the extent that they bought a lot of ground for which they paid $2,500) in the matter of establishing one of its presses, and, that being the situation, some negotiation took place between them and defendants concerning which there is a direct conflict of testimony. Plaintiff’s representatives say that the suggestion came from defendants, through an employé, that the establishment of two presses at Oklahoma City would be bad business for both of them, and that, the parties having come together, it was agreed that they should pool their interests as follows : That one party should fix a price at which a press should be built (on the lot which had been donated by the city) and the other should name the press to be built; that the party whose press was named should build it at the price fixed, and that the other party, by contributing half of the cost, should acquire a half interest in the enterprise. They further say that it was then agreed that they (or one of them, R. D. Webb) should fix the price, and that, knowing that they could put up a Webb press for $16,000 and make a profit, and believing that defendants could not put up a Bierce for less than $26,000, they fixed the price at $16,000, but that defendants, nevertheless, named the Bierce press as the press to be built; the result being that plaintiff became entitled,. *910 on payment of $8,000, to a half interest in a press which, so far as appears from the record, it would hare cost the defendants $26,000 to build, and to a half interest in the lot which had been donated by the city to the Oklahoma Cotton Compress Company, and was worth $3,000—their calculation, according to their testimony, being that plaintiff made a clear profit on the transaction of $6,500. They say, however, that on the following day defendants offered to buy out the 'interest which plaintiff had thus acquired (thereby, if the offer were accepted, bringing matters back to the point from which they started, save that the defendants would be $3,000 out of pocket) ; that they (plaintiffs) declined the offer, but after some further negotiation agreed to give or take $5,000 and call the previous agreement off; and that defendants accepted the proposition and agreed to give the $5,000, subject to the conditions contained in the contract sued on, which, plaintiff’s witnesses say, were added as afterthoughts, but which do not appear in that light in the contract.
Mr. R. D. Webb, who seems to have been the spokesman of his side, gives the following, with other testimony, to wit:
“Q. I understand you to say * * * that after this original proposition had been made, the next day, it was proposed, in lieu of finally consummating that proposition, to substitute this other one, which was finally put in shape: Is that a fact? A. The first proposition was accepted and agreed upon in the morning; the next proposition [referring to the offer of $3,000] was made by Mr. Hill, coming from Mr. Bierce, and we refused the second proposition, leaving the first one in vogue. Q. The second proposition? A. No writing was gone into on these propositions* up to that time. Q. Well, of course, if this partnership proposition that you are talking about—it was contemplated that it should be in writing about that? A. Yes, sir; we would have had it if we hadn’t had the other trade. Q. You would never dream, as a business man, of going into such a contract as that without writing it? A. No, sir; before we left them we would have bad to have a written agreement, signed by all parties. Q. There were all sorts of details, in connection with that thing, which would have to be worked out and reduced to writing? A. There were details—not all sorts, but a great many details. Q. Well, there were details with regard to the press, exactly what it was to be, and all the plans and specifications in regard to it? A. Yes, sir; that was all talked over. We went even so far as to talk over the question of the lumber. Q. And it was understood that all that was to be put in writing, in the shape of a formal contract? A. Yes, sir; we were to get one-half of the stock of the company 'for our interest. Q. In other words, there was a contract which Mr. Bierce and Mr. Hill proposed should be made with the Oklahoma Cotton Compress Company —they were the owners of the land? A. Yes, sir; but Mr. Bierce controlled everything. Everything that he did was to go, no matter what it was.”
J. Y. Webb, another of the plaintiff’s witnesses, says:
“The defendants had secured from the city of Oklahoma a lot worth about $3,000, with the understanding that they erect one of their compresses on it and operate the press. * *_ * My understanding was that the press which the donation called for was a Bierce press, and therefore the erection of any other would have made the donation null and void. * * * It was about this time that the plaintiff, through its agents, were in Oklahoma City for the purpose of locating and operating a compress. Competition was hot between plaintiff and defendants, at this time, as to who should build the press. Both presses could not exist there on a paying basis. No press had been erected, and both parties knew that only one would pay at that point.”
The defendants as witnesses deny that any agreement was made looking to the pooling of interests, and testify that the $5,000, called for by the contract, of which it is admitted that $2,500 was paid in cash, was to be paid for no other consideration than the obligation of the plaintiff to abandon its threatened competition in, and within 100 miles of, Oklahoma City.
Plaintiff’s witnesses say, in one breath, that they were calculating on acquiring a half interest in the lot which the City had donated to the Oklahoma Cotton Compress Company, and in another (substantially) that the price of the press to be built was fixed by them at $16,000, with the idea that a Bierce press could not be built for that amount, and hence that the Webb press would necessarily be named, and yet they admit that the erection of any other than the Bierce press would *912 have annulled the donation of the lot. They say that on payment of the $8,000 they were to get one-half of the stock of the Oklahoma Company (in the name and as the property of which the press was to have been operated); but the Bierces did not own all the stock in that company, and if they had transferred one-half of it to plaintiff they would, at once, have lost their control of the enterprise, besides giving away for the Oklahoma Company of which they were stockholders, $6,500 worth of property. Other features readily suggest themselves which render it difficult to believe that the defendants, if they are sane men, as they appear to be, could have entered into a contract such as that which we are now considering (referring, of course, to the alleged verbal contract).
And it is almost as difficult to believe that, if plaintiff had acquired the advantage which it is said to have acquired by that contract, it would have surrendered it at such an apparent pecuniary sacrifice. That there was discussion is very likely, but, as R. D. Webb testifies, there were many details to be considered, which, as the parties never reached the point of closing, by reducing to writing, any contract save that sued cm, were never considered or provided for. Upon the whole, our conclusion is that the alleged verbal contract never passed beyond the inchoate stage.
Opinion.
The conclusion as to the facts which has been stated—that plaintiff acquired no interest in the compress business which the defendants, as promoters of the Oklahoma Company were about establishing in Oklahoma City, leaves nothing of the contract sued on but a bald agreement in restraint of trade and in violation of the lex loci. If plaintiff owned any good will in Oklahoma, it consisted of the tendency of the public to buy its presses, rather than those of some other vendor, but it did not sell to defendant the right to vend those presses. It merely restrained itself from exercising a lawful business, thereby suppressing the “hot competition” which, according to the testimony of its witnesses, would have been prejudicial to the interests of both, but from which the public might have derived an advantage.
Our learned Brother of the district court has examined the questions presented with great care, and, after expressing his view, in an able and elaborate opinion, has rejected plaintiff’s demands. Among the authorities by which his conclusion is supported are: Tuscaloosa Ice Co. v. Williams, 28 South. 669, 50 L. R. A. 175, 85 Am. St. Rep. 125 (Supreme Court of Alabama, through .ucLellan, C. J.), and Oregon Steam Navigation Co. v. Winsor, 20 Wall. (U. S.) 64, 22 L. Ed. 315. To these may be added, as sustaining the proposition that “agreements in general restraint of trade are invalid because they deprive the public of the services of men in the sphere in which they are likely to be most useful and expose the community to the evils of monopoly”, the following authorities, cited in Benjamin’s Principles of Contracts, p. 94, to wit: Alger v. Thatcher, 19 Pick. (Mass.) 51, 31 Am. Dec. 119; Bishop v. Palmer, 146 Mass. 469, 16 N. E. 299, 4 Am. St. Rep. 339; Keeler v. Taylor, 53 Pa. 467, 91 Am. Dec. 221; Bank v. Morris Coal Co., 68 N. Y. 585; Craft v. McConoughy, 79 Ill. 346, 22 Am. Rep. 171.
Judgment affirmed.