ELIHU B. FROST, appellant,

*v.*

HENRY R. CARSE et al., respondents.

[Argued June term, 1919. Decided November term, 1919.]

1. A voting trust of a submarine boat corporation formed from the aggregate stockholders to preserve the identity of those who formed and developed the company, and to protect the stock from purchase by German government agents during the world war, removes it from the category of illegality.

2. In a suit by a trustee of a voting trust to remove a co-trustee, evidence that the defendant refused to serve as a director if the plaintiff was chosen on the board, and therefore required the voting trustees to choose between him and the plaintiff—*Held*, insufficient to show that the defendant had acted only with a view to his own aggrandizement, or that his conduct militated against the interests of the stockholders of the company.

3. An expenditure by a trustee of a voting trust to an agent to secure contracts with the United States navy for the construction of submarines, paid by the trustee individually—*Held*, not a misapplication of trust funds, and the fact that such agent was a blood relative of a prominent official, was not evidence of such a debasement or corruption of public officials as to warrant his removal at the suit of a co-trustee.

4. In a trustee's suit to remove his co-trustee, where prodigality was charged, and appropriations were made with complainant's assent of $50,000 annual salary to defendant with a bonus of $75,000; of a salary to complainant of $25,000, with a bonus of $130,000, and equally extravagant salaries to others, the equitable doctrine of clean hands is not inapplicable, and in any event, the parties being *in pari delicto*, equity will leave them where it finds them.

5. A trustee may not be removed at the suit of a co-trustee where no reasonably, positive and convincing proof has been produced to substantiate allegations of extravagance or corruption.

6. In the absence of a corporate request for such action, the corporate power to fill a vacancy caused by the death of a trustee cannot be taken from the corporation and voluntarily assumed and exercised by the court.

On appeal from a decree of the court of chancery advised by Vice-Chancellor Lane, whose opinion is reported *ante p. 52.*

*Messrs. McCarter & English,* and *Mr. Maurice Derches* (of the New York bar), for the complainant.

*Messrs. Pitney, Hardin & Skinner,* for the defendants Carse, Sutphen and Dawson.

*Messrs. Stein, Stein & Hannoch,* for Submarine Boat Corporation.

The opinion of the court was delivered by

MINTURN, J.

The facts in this case are adequately contained in the report of the opinion of the learned vice-chancellor in *91 N. J. Eq. 52.*

The bill was filed by complainant, a co-trustee, primarily against the defendant Carse, to procure his removal from a voting trust of the Electric Boat Company, and the Submarine Boat Company, upon the ground generally that in the direction of the companies' affairs he, by his unscrupulous and unconscientious dominance, had been unfaithful in the performance of his duties. Frost had acquired in the early eighties, with some friends, the control of the original submarine, the dubious product of the fertile genius of John P. Holland. At nearly every stage of its development, Frost was its mainstay and support, and has been in this litigation appropriately termed its *Deus ex machina.*

He nurtured it from infancy and introduced to its membership men of wealth and standing, in the financial world, and in naval circles, and procured contracts in the face of an atmosphere of jocularity and doubt, which looked askance upon the practicability of the scheme. Among others, in his dealings with the Hanover bank, he met the defendant Carse, and confided in him to such an extent that when Carse was not a director in the company he was urged by Frost to become its adviser and consulter.

Up to a period in 1916 Frost and Carse were upon intimate terms of friendship; a friendship which induced Frost to urge Carse for the presidency of the company, "because," as he wrote him, "I consider you the best man for the position, and hence my stock will be more valuable," and he therein advocated the payment to Carse of an annual salary of $50,000. Whatever happened between the two after that period is not sufficiently in evidence, but manifestly it was sufficiently acute to induce Carse in 1916 to decline to serve upon the board of trustees with Frost, so that the board retired Frost, and his co-trustee, Johnson, and elected others in their places.

The European war opened up a new and luminous vista to the trustees, and under its impetus, submarines were constructed for Great Britain, the United States and Chile, and the stock of the corporation, which went without purchasers upon the street at ten, now found willing investors at four hundred forty and more.

The voting trust was formed from the aggregate stockholders, to preserve the identity of those who formed and developed the company, and to protect the stock from purchase by German government agents. It was constituted of stockholders, the men who had nurtured the corporation from an era of uncertainty, to a status of highly successful recognition in the business world.

In that respect, and because of that fact, the voting trust is taken out of the category of illegality, which condemned the voting trusts in *Warren* v. *Pim, 66 N. J. Eq. 353,* and *Cone* v. *Russell, 48 N. J. Eq. 208,* upon which counsel for the appellant rely.

Into this situation of assured prosperity, the personal differences existing between Frost and Carse were injected. In the earlier days of suspense and uncertainty Frost and Rice, his financial coadjutor dominated, but with the passing of the lean and hungry years, and the advent of prosperity, Carse presents himself in the record, as the dominating factor of the enterprise. He had surrendered a position as vice-president of the Hanover bank, at a large salary, at the instance of the complainant, and his co-trustees, to accept the presidency of the corporation. He had rejected the offer of $50,000 annual salary and accepted the place at the reduced salary of $30,000 and his share of a bonus, which in practical effect meant a liberal share of the earnings of the company. When the personal trouble between the two acutely developed, Frost in 1917 filed a suit in the supreme court of New York, for the removal of Carse, upon grounds substantially similar to those here presented. That suit was allowed to lie dormant and this action was instituted. The vice-chancellor decided to dismiss the bill, and from that decree this appeal has been taken. It is insisted that the removal should be ordered because Carse participated in the distribution of the bonus in 1915 among the executive officers. To this Carse might properly reply *Tu quoque,* and a court of conscience would leave the parties concededly *in pari delicto* where it finds them.

For over a year Frost, who was a party to the distribution, remained silent upon the subject, and he admits that he received a bonus of $130,000, and states that he regrets he did not receive

more. With the legality of that act we are not concerned in this proceeding. In an appropriate proceeding the stockholders may have their remedy.

It is insisted also that for purposes of his own, Carse manipulated the affairs of the company, and the actions of his co-trustees with a view only to his own aggrandizement.

We agree with the vice-chancellor that the testimony in the case fails to support this allegation. It is insisted that Carse manipulated the action of his co-trustees at the annual election in 1917, and to that end voted for himself as a director. Unless his presence upon the board was inimical to the best interests of the company, and there is no evidence of the fact, we know of no rule of law which imposed silence or inaction upon him as a director and trustee of the corporate affairs, when the question practically was whether he would continue to devote his ability and experience to the company's affairs; and it must be recalled in that connection that his presence on the board after 1916 was due to no personal intrusion, but to the fact that he insisted upon a choice between himself and Frost. To this his co-trustees assented. They could have accepted the alternative of Frost, but they declined to part with Carse. Spear, one of the trustees, substantially declares that Carse had no ulterior purpose in his conduct of affairs, and that only the best service to the corporation actuated him. It nowhere appears that the conduct of Carse militated against the interests of the stockholders or the interests of the company, and the controversy, therefore, is practicially reduced to the personal equation of *argumentum ad hominum.*

But, the major allegation of the complainant is one based upon reasons of public policy, which seeks to attribute to Carse as a part of his *modus operandi,* the debasement and corruption of public officials in an effort to obtain contracts at Washington for submarine boat construction.

The company was experiencing trouble in the execution of contracts with the navy department at Washington. The officials of the company seemed unable to solve the difficulty, and at that juncture Ross McAdoo was injected into the situation. Carse had known McAdoo for some years and was cognizant

both of his ability and his impecuniosity. In the eyes of Carse, at that moment, apparently, McAdoo's greatest asset was centred in his name. He was the brother of a distinguished statesman, whose name and genius have been indelibly impressed upon one of the greatest engineering accomplishments in history; and whose record for public probity and integrity was never ques-tioned.

Ross McAdoo was in need of funds, and the submarine cor-poration in Carse's diplomatic and business eye was in need of Ross McAdoo. A new *modus operandi* was thereupon arranged by Carse, with the concurrence of Frost, whereby Ross McAdoo should serve as an emissary of the company at Washington. This experience cost Carse over $40,000, for which he took Ross McAdoo's notes. It cost the company nothing. The complain-ant presents it as one of the bases for his complaint, upon the ground that it was extravagantly lavish, and a misapplication of trust funds, for a corrupt purpose. Ross McAdoo has not been produced, but it is noticeable that in his suit against the corpora-tion in New York state for compensation he predicates his claim upon a promise of Frost as a trustee to pay him $100,000 for his services; Frost has not denied this, and it indicates his esti-mate of McAdoo's ability and power of service at that period.

The record shows that Frost was cognizant of payments to McAdoo, and never complained so as to make his complaint a basis for legal or equitable action, until his differences with Carse, in 1916 and 1917, suggested the alleged illegality of this transaction. His insistence now is, that public policy abhors an expenditure, which has as its basis the corruption of public offi-cials. No evidence of such corruption is given, except a state-ment made by Carse to Frost, which Carse denies making. In any event, the record shows that it was Carse's money which was expended upon McAdoo's venture, from the receipt of a bountiful bonus which he received jointly with complainant and his co-trustees, and which he was free to expend *ad libitum.*

Ross McAdoo, besides applying a large portion of it to the pay-ment of judgments against himself, occupied a representative status in Washington life which, in the modern business eye, as

9

well as his own, necessitated a liberality of expenditure commensurate with the character and dignity of his undertaking.

He lived at a high-class hotel, and there received his business callers in the modern business fashion of whetting their mentalities and dispositions to the friendly reception and discussion of the business in hand, by the prelude of an inviting display of gastronomic liberality and hospitality.

To do this adequately upon the contribution he received, and out of the same liquidate his judgment indebtedness, and maintain himself in a sphere comporting with the part he was to assume, as the representative of a corporation which numbered among its stockholders an Austrian Count, and a member of the British aristocracy, would require at least the princely sum he says was offered him by Frost, rather than the sum he actually received as the private contribution of Carse.

It may be safely assumed that the possession of that concession conferred upon Ross McAdoo, neither the means nor the inclination to assume a role of profligate and corrupt prodigality, made famous and infamous by the iniquities of Warren Hastings in the Carnatic.

If this situation constituted evidence of prodigality with corporate funds of Carse, what shall be said of the appropriations made with complainant's assent of $50,000 annual salary to Carse with the bonus of $75,000; of a salary of $25,000 to himself and a bonus of about $130,000; $25,000 salary to Spear; $20,000 to Davison; $12,000 to Sutphen; $10,000 to Johnson, besides their shares of the bonus from an appropriation for that purpose, amounting to $400,000 of the corporate earnings?

In such a situation the equitable doctrine of clean hands is not inapplicable; and, in any event, the rule is familiar that the parties being *in pari delicto,* equity will leave them where it finds them. *Edgar* v. *Fowler, 3 East 225; Wheeler* v. *Sage, 1 Wall. (U. S.) 518; Manhattan Medical Co.* v. *Wood, 108 U. S. 218; Craft* v. *McConoughy, 79 Ill. 346.*

In such a situation reasonably, positive and convincing proof must be adduced to substantiate the allegation either of extravagance or corruption, as the basis for the removal of a trustee,

and the case at bar presents no such evidence. At most, we perceive in the case a controversy between two conflicting individual interests, and not an inquiry originated by or intended to subserve the corporate or stockholding interests, and in that light we have dealt with the situation.

The vice-chancellor deemed it necessary to suggest in his opinion the appointment by the court of a trustee to fill a vacancy caused by the death of one of the trustees.

In the absence of a corporate request for such action, we fail to perceive upon what legal principle the power to fill the vacancy can be taken from the corporation and voluntarily assumed and exercised by the court.

The decree appealed from will be affirmed. .

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, BERGEN, MINTURN, KALISCH, HEPPENHEIMER, ACKERSON—8.

*For reversal*—PARKER, BLACK, WHITE, WILLIAMS, TAYLOR, GARDNER—6.